[No. A096763. First Dist., Div. Two. Feb. 14, 2003.]

RICHELLE L., Plaintiff and Appellant, v.
ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO et al.,
Defendants and Respondents.

COUNSEL

Brian J. McCaffrey for Plaintiff and Appellant.

Tobin & Tobin, Paul E. Gaspari and Lawrence R. Jannuzzi for Defendants and Respondents.

OPINION

KLINE, P. J.—Appellant, Richelle L., is a member of the Church of Our Lady of Mount Carmel in San Francisco. Respondent Reverend Felix Namocatcat is employed by respondent Roman Catholic Archdiocese[1] (Archdiocese) as a priest at that church. This civil action for damages was commenced by appellant to compensate for the injuries she allegedly sustained as a result of a sexual relationship initiated by Reverend Namocatcat, who, she alleges, exploited a position of power and trust.

The trial court sustained respondents' demurrers without leave to amend. The ruling reflects the trial court's acceptance of respondents' contention that subjecting a member of the clergy and his church to tort liability for the manner in which an ecclesiastical officer carries out his pastoral responsibilities would excessively entangle the court in religious beliefs and practices, in violation of the religion clauses set forth in the First Amendment of the United States Constitution and article I, section 4, of the California Constitution. These constitutional provisions guarantee the free exercise of religion and bar laws respecting an establishment of religion.

Appellant timely appeals from the judgment for respondents entered by the court on the basis of its order sustaining the demurrers without leave to amend. We shall conclude that, contrary to the apparent belief of the trial court, there are circumstances in which tort liability for breach of a fiduciary duty may be imposed on a pastor for injuries resulting from the pastor's sexual misconduct with a parishioner without offense to the religion clauses. We shall also conclude, however, that those circumstances are not present in this case, and for that reason affirm the judgment.

---

[1]The complaint names as defendant the "Roman Catholic Archbishop of San Francisco, a corporation sole," but internally refers to this defendant as "the Archdiocese," defined as "a corporation sole organized and existing under and by virtue of the laws of the State of California, with its principal place of business in San Francisco, California and is and was, at all times relevant to this complaint, the employer of [respondent] Rev. Felix Namocatcat." Because it is clear the complaint refers to an entity rather than a person, we follow the parties in referring to the defendant as Archdiocese.

## I. FACTS

■ Because this appeal is from a pretrial ruling sustaining demurrers without leave to amend, our recitation of the facts assumes the truth of all facts properly pleaded by the plaintiff-appellant (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 814 [107 Cal.Rptr.2d 369, 23 P.3d 601]; *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 579 [94 Cal.Rptr.2d 3, 995 P.2d 139]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]), and likewise accepts as true all facts that may be implied or inferred from those she expressly alleges. (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403 [44 Cal.Rptr.2d 339].)

In September of 1999 Reverend Namocatcat persuaded appellant to have sexual relations with him in the rectory of Our Lady of Mount Carmel Church, at which he was pastor and she was a parishioner. Prior to this relationship, appellant "was chaste and had never been involved in a sexual relationship." Reverend Namocatcat called appellant once or more each day and often left "romantic and sexual messages" on her answering machine. He also falsely represented to her that he had never had sexual relations with others, that his sexual relationship with her was not improper, and that he intended to retire in the area of the parish in order to remain near her. Prior to his relationship with appellant, Reverend Namocatcat had had a sexual relationship with another female member of the parish, and before that with women in other parishes to which he had previously been assigned. Reverend Namocatcat's "propensity for breaking his vows of celibacy" was well known and tolerated by other representatives of the Archdiocese.

In the exercise of his skill and knowledge as a priest and pastor, Reverend Namocatcat knew appellant was "deeply religious" and would therefore "be readily subject to manipulation and control by a pastor, and her judgment and ability to resist or reject his advances was substantially compromised by her religious faith and trust." Respondent Archdiocese and its agents and employees knew of Reverend Namocatcat's prior sexual misconduct and his sexual misconduct with appellant due, among other things, to the open and notorious nature of his sexual activities and his frequent use of the rectory for sexual encounters with parishioners.[2] The Archdiocese knew a parish priest occupies a superior position of power and influence that can be abused

---

[2]Appellant did not set forth any specific theory of imputed knowledge and notice. We assume she treats the priests and others employed by the Archdiocese as its agents, and relies upon the doctrine that "[a]n agent is under a duty to inform his principal of matters in connection with the agency which the principal would desire to know about. (Rest.2d, Agency § 381.) Even if he fails to do so, the principal will in most cases be charged with such notice. 'As against a principal, both principal and agent are deemed to have notice of whatever either

to manipulate parishioners and cause them serious emotional and psychological harm and, because of its knowledge of Reverend Namocatcat's sexual relationships with numerous parishioners, the Archdiocese knew or should have known that employing Reverend Namocatcat as parish priest created an unreasonable risk of harm to appellant and others.

The complaint alleges that as a result of respondents' breaches of their duties toward appellant, she has suffered and continues to suffer "irrevocable mental, physical and emotional harm; depression; mental and emotional distress; weight loss; public humiliation; and loss of her religious faith." Appellant seeks punitive damages against Reverend Namocatcat on the ground that his acts were "willful and malicious."

## II. PROCEEDINGS BELOW

The complaint states seven causes of action. The first and the seventh, which allege breach of fiduciary duty and "general negligence," are against both Reverend Namocatcat and the Archdiocese. The fourth, fifth and sixth causes of action allege fraud and deceit, intentional infliction of emotional distress and negligent infliction of emotional distress only against Reverend Namocatcat, and the second and third causes of action allege negligent supervision/retention and negligent hiring only against the Archdiocese.

Respondent Archdiocese demurred on the ground that, with respect to the causes of action against it, the complaint failed to state facts sufficient to constitute a cause of action. On February 21, 2001, the Honorable David A. Garcia sustained the demurrer with leave to amend to allege further facts regarding the issue of prior notice to the Archdiocese of Reverend Namocatcat's alleged sexual propensities and reckless disposition.

The first amended complaint was filed on March 6, 2001. Reverend Namocatcat demurred to that pleading on April 4, 2001, and the Archdiocese separately filed general and special demurrers six days later. The thesis of all the demurrers, which rested on the First Amendment, was that respondents "did not owe a civil duty, fiduciary or otherwise, to [appellant] in these *or any other circumstances,*" and "[t]his lack of duty is fatal to each cause of action." (Italics added.)

On May 9, 2001, the Honorable William J. Cahill sustained all of respondents' demurrers without leave to amend, and on that basis entered judgment

---

has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other.' [Citations.]" (2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 99, p. 97; *Powell v. Goldsmith* (1984) 152 Cal.App.3d 746, 751 [199 Cal.Rptr. 554]; *Columbia Pictures Corp. v. DeToth* (1948) 87 Cal.App.2d 620, 630 [197 P.2d 580].)

against appellant on August 10, 2001. ■ Because it leaves no issue for future consideration and terminates the litigation between the parties on the merits of the case, a judgment entered after the sustaining of demurrers without leave to amend is appealable. (*Olson v. Cory* (1983) 35 Cal.3d 390, 399 [197 Cal.Rptr. 843, 673 P.2d 720].)

## III. STANDARD OF REVIEW

■ "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]" (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318.) "[I]n ruling on a demurrer, the trial court is obligated to look past the form of a pleading to its substance. Erroneous or confusing labels attached by the inept pleader are to be ignored if the complaint pleads facts which would entitle the plaintiff to relief. [Citation.]" (*Saunders v. Cariss* (1990) 224 Cal.App.3d 905, 908 [274 Cal.Rptr. 186].) The task of the reviewing court, therefore, "is to determine whether the pleaded facts state a cause of action on any available legal theory." (*Ibid.*) Where, as here, a demurrer is sustained without leave to amend, we decide whether there is a reasonable possibility the defect can be cured by amendment; if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.

## IV. DISCUSSION

### *Duty of Reverend Namocatcat*

#### A.

■ The causes of action against Reverend Namocatcat—breach of fiduciary duty, fraud and deceit, and intentional and negligent infliction of emotional distress[3]—all arise from alleged conduct that can fairly be described as a sexual seduction. The threshold question, therefore, is whether such causes are barred by Civil Code section 43.5 (section 43.5). Subdivision (c) of that statute provides that no cause of action arises for alienation of affection, criminal conversation (i.e., the tort of seducing a wife), breach of promise of marriage, and, pertinent to the case before us, "seduction of a person over the age of legal consent." ■ Sometimes referred to as the

[3]We disregard appellant's catchall cause of action for "general negligence" alleged against both respondents because we cannot discern its meaning or purpose.

"anti-heart-balm statute," section 43.5 "was enacted to eliminate a class of lawsuits which were often fruitful sources of fraud and extortion and easy methods 'to embarrass, harass, and besmirch the reputation of one wholly innocent of wrongdoing.' (*Ikuta* v. *Ikuta* (1950) 97 Cal.App.2d 787, 789 [218 P.2d 854]; see also *Boyd* v. *Boyd* (1964) 228 Cal.App.2d 374, 377 [39 Cal.Rptr. 400].)" (*Richard H.* v. *Larry D.* (1988) 198 Cal.App.3d 591, 595 [243 Cal.Rptr. 807].) The statute creates a blanket immunization from liability for the conduct it protects unless such conduct "breaches a duty of care *independent* of the causes of action barred therein." (*Ibid.*, italics added; accord, *Smith* v. *Pust* (1993) 19 Cal.App.4th 263, 269 [23 Cal.Rptr.2d 364].)

" 'Seduction imports the idea of illicit intercourse accomplished by the use of arts, persuasions, or wiles to overcome the resistance of a female who is not disposed of her own volition to step aside from the paths of virtue. [Citation.]' (*Davis* v. *Stroud* (1942) 52 Cal.App.2d 308, 317 [126 P.2d 409]) . . . . [¶] The old action of seduction required that the woman was '. . . chaste and virtuous at the time of the alleged seduction . . .' (*Davis* v. *Stroud, supra*, 52 Cal.App.2d at p. 316), and it was used primarily to protect young, inexperienced women who had succumbed to the sexual advances of older men. (See *Carter* v. *Murphy* (1938) 10 Cal.2d 547 [75 P.2d 1072].)" (*Barbara A.* v. *John G.* (1983) 145 Cal.App.3d 369, 377 [193 Cal.Rptr. 422].)

██ Because section 43.5 means it is no longer possible for two consenting adults in the state of California to engage in "illicit intercourse" (*ibid.*), appellant cannot prevail on her causes of action against Reverend Namocatcat unless she can establish that his alleged conduct breached a duty of care independent of the statutorily barred cause of action for seduction. ██ Abolition of seduction and the other causes of action listed in section 43.5 does not preclude a person from maintaining a recognized tort action merely because the breach arose from the seduction of the plaintiff or one or more of the other forms of sexual conduct enumerated in that statute. All the "anti-heart-balm statute" precludes is the mere recharacterization of the abolished amatory cause of action as a form of negligence or some other acknowledged tort. (See, e.g., *Strock* v. *Pressnell* (1988) 38 Ohio St.3d 207, 215 [527 N.E.2d 1235, 1242-1243, 75 A.L.R.4th 729] [abolished torts of alienation of affections and criminal conversation not revived by recognition of the independent tort of intentional infliction of emotional distress].) A plaintiff cannot, in other words, camouflage an abolished action with the catchwords of the common law. The question is whether the essence of the cause of action is something more than mere seduction.

██ Appellant maintains that Reverend Namocatcat has breached a duty separate and independent of any duty not to seduce because he stood in a

special relationship with her comparable to lawyer-client and doctor-patient relationships, and thus owed her the highest duty of care and good faith. She claims he also stood in a "fiduciary relationship" with her and his conduct breached the fiduciary duty arising out of that relationship. Special and fiduciary relationships both impose a special duty of care but, because they are distinguishable in certain important respects, we separately discuss their application to this case.

B.

Appellant's argument that she stands in a special relationship with Reverend Namocatcat rests on assertedly analogous cases involving physicians and attorneys. Appellant relies most heavily upon *Richard H. v. Larry D., supra*, 198 Cal.App.3d 591 and *McDaniel v. Gile* (1991) 230 Cal.App.3d 363 [281 Cal.Rptr. 242]. In both cases the bar of section 43.5 was held inapplicable, and liability allowed, because the defendants breached a professional duty of care independent of the cause of action for seduction barred by that statute. Appellant contends that the special relationship rationale of these and similar cases applies with equal force in this case. We cannot agree.

*Richard H. v. Larry D., supra*, 198 Cal.App.3d 591 was a suit by a patient against a doctor and the hospital employing him for fraud, professional negligence, and negligent infliction of emotional distress based on the surreptitious sexual relations the doctor had with the patient's wife while the couple were the doctor's patients for purposes of marital counseling. The Court of Appeal reversed an order sustaining a demurer without leave to amend, holding that the action was not barred by section 43.5 because the doctor's conduct constituted professional negligence; that is, a " 'breach of *the duty of care owed to the patient by the physician within the scope of the patient-physician relationship.*' " (*Richard H.*, at p. 595, quoting *Atienza v. Taub* (1987) 194 Cal.App.3d 388, 392 [239 Cal.Rptr. 454], italics omitted.)

In *McDaniel v. Gile, supra*, 230 Cal.App.3d 363, a client filed a cross-complaint against her attorney, who had initiated an action against her for unpaid legal fees, alleging legal malpractice and intentional infliction of emotional distress arising from the attorney's failure to perform legal services after the client rejected his sexual advances. The trial court granted the attorney summary adjudication on both the claim of intentional infliction of emotional distress and that of malpractice. The Court of Appeal reversed, holding, as material, that a triable issue of fact existed as to the legal malpractice cause of action, since an attorney's withholding legal services or rendering substandard services after a client's rejection of his sexual advances necessarily falls below the standard of care and skill of members of the legal profession.

*Richard H. v. Larry D., supra,* 198 Cal.App.3d 591, *McDaniel v. Gile, supra,* 230 Cal.App.3d 363 and other California cases involving physicians and attorneys (e.g., *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583 [257 Cal.Rptr. 98, 770 P.2d 278]; *McNall v. Summers* (1994) 25 Cal.App.4th 1300 [30 Cal.Rptr.2d 914]; *Atienza v. Taub, supra,* 194 Cal.App.3d 388; *Barbara A. v. John G., supra,* 145 Cal.App.3d 369) are inapposite, because the malpractice claims that may be made against physicians, psychotherapists, and attorneys cannot be made against members of the clergy. There is no such thing in the law as clerical malpractice.

The reason is set forth in *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 298 [253 Cal.Rptr. 97, 763 P.2d 948] (*Nally*). Our Supreme Court held in that case that the legislative exemption of clergy from licensing requirements applicable to other counselors acknowledges "that access to the clergy for counseling should be free from state imposed counseling standards, and that 'the secular state is not equipped to ascertain the competence of counseling when performed by those affiliated with religious organizations.' [Citation.]" (*Ibid.*) As the *Nally* court elaborated, "[b]ecause of the differing theological views espoused by the myriad of religions in our state and practiced by church members, it would certainly be impractical, and quite possibly unconstitutional, to impose a duty of care on pastoral counselors. Such a duty would necessarily be intertwined with the religious philosophy of a particular denomination or ecclesiastical teachings of the religious entity." (*Id.* at p. 299.)

*Nally* is widely relied upon for the proposition that there is no independent tort known as "clerical malpractice," not only by California courts (*Jacqueline R. v. Household of Faith Family Church, Inc.* (2002) 97 Cal.App.4th 198 [118 Cal.Rptr.2d 264]; *Roman Catholic Bishop v. Superior Court* (1996) 42 Cal.App.4th 1556 [50 Cal.Rptr.2d 399]), but by those elsewhere (see, e.g., *F.G. v. MacDonell* (1997) 150 N.J. 550, 562 [696 A.2d 697, 703]; *Schieffer v. Catholic Archdiocese of Omaha* (1993) 244 Neb. 715, 720 [508 N.W.2d 907, 911]; *Strock v. Pressnell, supra,* 527 N.E.2d 1235, 1238-1239) and by many commentators (see, e.g., O'Reilly & Strasser, *Clergy Sexual Misconduct: Confronting the Difficult Constitutional and Institutional Liability Issues* (1994) 7 St. Thomas L.Rev. 31, 56 (hereafter *Clergy Sexual Misconduct*); Note, *Intentional Infliction of Emotional Distress by Spiritual Counselors: Can Outrageous Conduct Be "Free Exercise"?* (1986) 84 Mich. L.Rev 1296, fn. 1; Esbeck, *Tort Claims Against Churches and Ecclesiastical Officers: The First Amendment Considerations* (1986) 89 W. Va. L.Rev. 1, 78-84). The fact that that no state or federal court in the United States now recognizes a cause of action for clergy malpractice (see *Dausch v. Rykse* (7th Cir. 1994) 52 F.3d 1425, 1432, fn. 4 (conc. opn. of Coffey, J.) [listing state supreme

court cases rejecting a cause of action for clergy malpractice]) reflects widespread judicial acceptance of the *Nally* view that an action for clergy malpractice cannot be reconciled with the First Amendment because a standard of care and its breach could not be established without judicial determinations as to the training, skill, and standards applicable to members of the clergy in a wide array of religions holding different beliefs and practices. Even if a reasonable standard could be devised, which is questionable, it could not be uniformly applied without restricting the free exercise rights of religious organizations which could not comply without compromising the doctrines of their faith. The application of such a standard would also result in the establishment of judicially acceptable religions, because it would inevitably differentiate ecclesiastical counseling practices that are judicially acceptable from those that are not.

For the foregoing reasons, we conclude that Reverend Namocatcat cannot be liable to appellant for breach of a duty arising out of a special relationship analogous to that between attorneys and their clients and physicians and psychotherapists and their patients. If Reverend Namocatcat can be shown to have caused the injuries appellant alleges, he can be subjected to tort liability only if, as appellant also claims, his alleged conduct breached a fiduciary duty.

### C.

Respondents contend that the constitutional considerations preventing the trial court from treating their relationship as a "special relationship" similar to that which certain professionals have with patients or clients also prohibited it from defining the relationship between a pastor and parishioner as a fiduciary relation. In respondents' view, appellant's cause of action for breach of a fiduciary duty is merely another way of alleging that respondents' conduct amounts to professional malpractice.

It is useful at the outset to clear away some terminological confusion. " '[F]iduciary' and 'confidential' have been used synonymously to describe ' ". . . any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he [or she] voluntarily accepts or assumes to accept the confidence, can take no advantage from his [or her] acts relating to the interest of the other party without the latter's knowledge or consent. . . ." ' (*Herbert* v. *Lankershim* (1937) 9 Cal.2d 409, 483 [71 P.2d 220]; *Bacon* v. *Soule* (1912) 19 Cal.App. 428, 434

[126 P. 384].) Technically, a fiduciary relationship is a recognized legal relationship such as guardian and ward, trustee and beneficiary, principal and agent, or attorney and client (see Frankel, *Fiduciary Law* (1983) 71 Cal.L.Rev. 795), whereas a 'confidential relationship' may be founded on a moral, social, domestic, or merely personal relationship as well as on a legal relationship. (See *Stevens* v. *Marco* (1956) 147 Cal.App.2d 357, 374 [305 P.2d 669]; *Bolander* v. *Thompson* (1943) 57 Cal.App.2d 444, 447 [134 P.2d 924]; *Robbins* v. *Law* (1920) 48 Cal.App. 555, 561 [192 P. 118].) The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." (*Barbara A. v. John G., supra,* 145 Cal.App.3d 369, 382.)[4]

The statement in some of the cases that fiduciary and confidential relationships are synonymous[5] obscures some significant differences. As our Supreme Court has stated, " '[a] confidential relation may exist although there is no fiduciary relation . . . .' " (*Vai v. Bank of America* (1961) 56 Cal.2d 329, 337-338 [15 Cal.Rptr. 71, 364 P.2d 247], quoting Rest.2d Trusts, § 2, com. b, p. 6; see also *Robins v. Hope, supra,* 57 Cal. 493, 497.) Unlike confidential relations, fiduciary relations arise out of certain canonical relationships that are legally defined and regulated. Thus, to take just one of many possible examples, the Legislature has declared that the "relationship of . . . conservator and conservatee is a fiduciary relationship that is

---

[4]A similar definition, but one which makes clear the nondispositive nature of the particular context in which confidence is reposed and accepted, was provided by United States Supreme Court Justice William J. Brennan, Jr., when he was a member of the Appellate Division of the Superior Court of New Jersey: "A confidential relation is not confined to any specific association of the parties, 'Its essentials are a reposed confidence and the dominant and controlling position of the beneficiary of the transaction.' [Citation.] 'It is clear that the dominance must be of the mind, and the dependence must be upon the mind rather than upon the hands and feet of the donee.' [Citation.] It exists when the circumstances make it certain that the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." (*In re Stroming's Will* (1951) 12 N.J. 217, 224 [79 A.2d 492, 495].)

[5]In addition to *Barbara A. v. John G, supra,* 145 Cal.App.3d at page 383, see, for example, *Robins v. Hope* (1881) 57 Cal. 493, 497, overruled on other grounds in *Seeger v. Odell* (1941) 18 Cal.2d 409, 417 [115 P.2d 977, 136 A.L.R. 1291] ("The phrases 'confidential relation' and 'fiduciary relation' seem to be used by the courts and law writers as convertible terms."); *Recorded Picture Company [Productions] Ltd. v. Nelson Entertainment, Inc.* (1997) 53 Cal.App.4th 350, 370 [61 Cal.Rptr.2d 742] (" 'A "fiduciary relation" in law is ordinarily synonymous with a "confidential relation." ' "); *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1579-1580 [36 Cal.Rptr.2d 343]; *Main v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1977) 67 Cal.App.3d 19, 31 [136 Cal.Rptr. 378], overruled on other grounds in *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 407 [58 Cal.Rptr.2d 875, 926 P.2d 1061]; *Twomey v. Mitchum, Jones, & Templeton, Inc.* (1968) 262 Cal.App.2d 690, 708 [69 Cal.Rptr. 222]; *Bacon v. Soule, supra,* 19 Cal.App. 428, 434.

governed by the law of trusts . . ." (Prob. Code, § 2101); the law of trusts, a great deal of which is statutory, defines the nature of the fiduciary duties arising out of that particular fiduciary relationship with considerable precision. (See, e.g., *Conservatorship of Lefkowitz* (1996) 50 Cal.App.4th 1310 [58 Cal.Rptr.2d 299].) Because confidential relations do not fall into well-defined categories of law and depend heavily on the circumstances, they are more difficult to identify than fiduciary relations.

■■ ▬■ The vagueness of the common law definition of the confidential relation that gives rise to a fiduciary duty, and the range of the relationships that can potentially be characterized as fiduciary,[6] led one court to usefully distill the essential elements as follows: "1) The vulnerability of one party to the other which 2) results in the empowerment of the stronger party by the weaker which 3) empowerment has been solicited or accepted by the stronger party and 4) prevents the weaker party from effectively protecting itself." (*Langford v. Roman Catholic Diocese of Brooklyn* (1998) 177 Misc.2d 897, 900 [677 N.Y.S.2d 436, 438], affd. (2000) 271 A.D.2d 494 [705 N.Y.S.2d 661], citing Scallen, *Promises Broken vs. Promises Betrayed: Metaphor, Analogy, and the New Fiduciary Principle* (1993) 1993 U. Ill. L.Rev. 897, 922.)

---

[6]"A 'confidential relationship,' as that term is used in the cases, refers to an unequal relationship between parties in which one surrenders to the other some degree of control because of the trust and confidence which he reposes in the other. When a confidential relationship is found to exist, the one in whom confidence was reposed may be held to a higher standard of disclosure and fairness than in an arm's-length relationship. . . . [¶] The cases are in accord that the existence of a confidential relationship is a question of fact. There thus does not appear to be any requirement that it be objectively reasonable for the plaintiff (or the one who asserts the existence of the confidential relationship) to have reposed trust and confidence in the other: the question is only whether the plaintiff actually reposed such trust and confidence in the other, and whether the other 'accepted the relationship.' For this reason it is not possible to articulate rules about when confidential relationships may be said to arise: they may not arise where one might think they would (as between family members and relatives), and they may arise where one might think they would not (as between an adult and someone she had met only once or twice.)" (Chodos, The Law of Fiduciary Duties (2000) pp. 49-50.) A confidential relationship cannot be imposed on an individual, but must be voluntarily accepted. (*Id.* at p. 51, citing *Bacon v. Soule, supra,* 19 Cal.App. 428, 436 and *Ruhl v. Mott* (1898) 120 Cal. 668 [53 P. 304].) As a general rule, the relationship is not created simply by the receipt of confidential information. (*Barajas v. Oren Realty & Development Co.* (1997) 57 Cal.App.4th 209 [67 Cal.Rptr.2d 62].) "The mere fact that A receives the confidences of B does not turn A into B's fiduciary, nor does it create a relationship of trust and confidence. A 'relationship' has to exist over a period of time, and the divulging of a single confidence—even an important one—does not create a relationship (even though it may be evidence that such a relationship exists). Nevertheless, the receipt of confidential information may impose some duty on the recipient." (Chodos, The Law of Fiduciary Duties, *supra,* at p. 53, italics omitted.) As used in the cases pertaining to confidential relations, the terms "trust" and "confidence" refer to the anticipation or expectation that another person will act, or forbear from acting, in a particular way. (*Id.* at p. 49.)

The vulnerability that is the necessary predicate of a confidential relation, and which the law treats as "absolutely essential" (Bogert, Trusts & Trustees (2d ed. 1978) § 482, at pp. 288-289), usually arises from advanced age, youth, lack of education, weakness of mind, grief, sickness, or some other incapacity. For example, in *Stenger v. Anderson* (1967) 66 Cal.2d 970 [59 Cal.Rptr. 844, 429 P.2d 164], an elderly woman in a weakened mental and physical condition was induced by a friend to make an unfair agreement. The Supreme Court sustained rescission of the agreement, holding that the relationship was "confidential" and the agreement obtained by undue influence. (*Id.* at p. 979.) Similarly, in *O'Neil v. Spillane* (1975) 45 Cal.App.3d 147 [119 Cal.Rptr. 245] this court upheld an order directing the reconveyance of real property to the plaintiff, "an aging and lonely woman . . . increasingly dependent upon a few friends," who had been subjected to undue influence by a friend and his wife. (*Id.* at p. 151; see also *Kent v. First Trust & Savings Bank of Pasadena* (1951) 101 Cal.App.2d 361 [225 P.2d 625].)

As noted in the Restatement, one standing in a confidential or fiduciary relation with another "is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." (Rest.2d Torts, § 874.) Therefore, "[a] fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct to the person for whom he should act. . . . [T]he liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation." (*Id.*, com. b, p. 300.)

Courts in other jurisdictions are divided on whether it is constitutionally permissible to subject a member of the clergy to tort liability for the breach of a fiduciary duty to a parishioner. Some have adopted respondents' view that the claim a member of the clergy violated a fiduciary duty is simply another way of saying that he or she committed malpractice, and is barred by the First Amendment for the same reasons. (See, e.g., *Teadt v. Lutheran Church Missouri Synod* (2000) 237 Mich.App. 567 [603 N.W.2d 816, 822-823]; *Dausch v. Rykse, supra,* 52 F.3d 1425, 1429 [claim for breach of fiduciary duty by pastor and church not recognized by Illinois law]; *Schieffer v. Catholic Archdiocese of Omaha, supra,* 508 N.W.2d 907, 912; *Bladen v. First Presbyterian Church of Sallisaw* (1993) 1993 Okla. 105 [857 P.2d 789, 796]; *Schmidt v. Bishop* (S.D.N.Y. 1991) 779 F.Supp. 321, 326; *Strock v. Pressnell, supra,* 527 N.E.2d 1235, 1243-1244.) As stated by a Missouri court, "analyzing and defining the scope of fiduciary duty owed persons by their clergy (assuming pastoral relationships were 'fiduciary') would require courts to define and express the standard of care followed by reasonable clergy of the particular faith involved, which in turn 'would

require the Court and the jury to consider the fundamental perspective and approach to counseling inherent in the beliefs and practices of that denomination.' " (*H.R.B. v. J.L.G.* (Mo.Ct.App. 1995) 913 S.W.2d 92, 98.) Such an approach would offend the First Amendment, the court concluded, because it would foster " 'excessive entanglement with religion.' " (*Ibid.*)

Other courts reject this view, however, and allow claims by parishioners that members of the clergy breached a fiduciary duty as a result of sexually inappropriate conduct in the course of pastoral counseling, believing such claims can be adjudicated without reference to religious doctrine or practice where the conduct at issue is not part of the beliefs and practices of the defendant's religion. (See *Wisconsin v. Yoder* (1972) 406 U.S. 205, 215-216 [92 S.Ct. 1526, 1533, 32 L.Ed.2d 15] ["to have the protection of the Religion Clauses, the claims must be rooted in religious belief"].) In the view of these courts, an action for breach of fiduciary duty does not require establishing a standard of care and its breach but merely proof that a vulnerable parishioner trusted and sought counseling from the pastor and a violation of that trust, which constitutes a breach of fiduciary duty. (*Doe v. Evans* (Fla. 2002) 814 So.2d 370; *F.G. v. MacDonell, supra,* 150 N.J. 550, 565 [696 A.2d 697, 704-705]; *Destefano v. Grabrian* (Colo. 1988) 763 P.2d 275, 283-284; see also *Doe v. Hartz* (N.D.Iowa 1999) 52 F.Supp.2d 1027, 1060-1062 [interpreting Iowa law]; *Sanders v. Casa View Baptist Church* (N.D.Tex.1995) 898 F.Supp. 1169, 1176 [interpreting Texas law]; *Moses v. Diocese of Colorado* (Colo. 1993) 863 P.2d 310, 323; *Erickson v. Christenson* (1989) 99 Or.App. 104, 108 [781 P.2d 383, 386]; *Adams v. Moore* (1989) 96 N.C.App. 359 [385 S.E.2d 799, 801].)

In *Doe v. Evans, supra,* 814 So.2d 370, *F.G. v. MacDonell, supra,* 696 A.2d 697, and *Destefano v. Grabrian, supra,* 763 P.2d 275, the Supreme Courts of Florida, New Jersey and Colorado determined that, without impinging on the First Amendment, courts could resolve claims that defendant clergy members violated a fiduciary duty by engaging in sexually inappropriate conduct during the course of pastoral counseling, because the claims arose from purely secular conduct and were not defended on the basis of a sincerely held religious belief or practice. Moreover, "[u]nlike an action for clergy malpractice, an action for breach of fiduciary duty does not require establishing a standard of care and its breach. . . . Establishing a fiduciary duty essentially requires proof that a parishioner trusted and sought counseling from the pastor. A violation of that trust constitutes a breach of the duty." (*F.G. v. MacDonell, supra,* 696 A.2d at p. 704.)

There is support for this unwillingness to view the First Amendment as conferring immunity from tort liability on members of the clergy who

engage in sexual misconduct. As one commentator has stated, "[f]ew would have the hardihood to claim first amendment immunity in defense of a suit charging a rabbi, priest, or pastor with sexual improprieties involving others connected with the church. These cases fall into one of two patterns: either a minister is alleged to have taken sexual advantage of a woman he is counseling, or a cleric is said to have sodomized young children placed under his charge. Because no credible argument can be made that such conduct is even 'arguably religious,' or caused by the promptings of spiritual duty, these torts are not shielded by protestations of religious liberty." (Esbeck, *Tort Claims Against Churches and Ecclesiastical Officers: The First Amendment Considerations, supra,* 89 W. Va. L.Rev. 1, at p. 87; accord, *Note, Intentional Infliction of Emotional Distress by Spiritual Counselors: Can Outrageous Conduct Be "Free Exercise"?, supra,* 84 Mich.L.Rev. at pp. 1322-1325 ["If the particular conduct alleged to have caused plaintiff's distress was not dictated by religious belief or practice, then the conduct was not the free exercise of religion, and the defense is unavailable."].)

No California court has determined whether or the circumstances in which the religion clauses would be offended by imposing tort liability on a member of the clergy for sexual misconduct constituting the breach of a fiduciary duty owed a parishioner.[7] The question whether a member of the clergy may be subjected to a fiduciary duty was not presented in *Nally* and nothing in the opinion in that or any other California case suggests that imposing such a duty on a member of the clergy standing in a confidential relation with a plaintiff-parishioner would necessarily offend either the free exercise or establishment clauses of the state and federal Constitutions. However, without discussion of the constitutional issues, the California Supreme Court has accepted the Restatement position that a "priest and a penitent" may have a confidential relationship giving rise to tort liability for the breach of a fiduciary duty. (*Vai v. Bank of America, supra,* 56 Cal.2d 329, 338 [confidential relation " 'is particularly likely to exist where there is a family relationship or one of friendship or such a relation of confidence as that which arises between physician and patient *or priest and penitent*' " (italics added)]; Rest.2d Trusts, § 2, com. b, p. 6.) This court has subjected a member of the clergy to tort liability for breach of a confidential relation with a parishioner, although the case involved a financial transaction and no constitutional question was presented. (*In re Estate of Miller* (1936) 16

---

[7] In *Mark K. v. Roman Catholic Archbishop* (1998) 67 Cal.App.4th 603 [79 Cal.Rptr.2d 73], the plaintiff alleged that "a special fiduciary relationship" existed between himself and the church, and was breached by a parish priest, but it was unnecessary for the court to decide the tenability of the claim as a matter of law because the plaintiff's claims were all barred by applicable statutes of limitation. The court in *Jacqueline R. v. Household of Faith Family Church, Inc., supra,* 97 Cal.App.4th 198, 207, specifically left open the question "whether the confidential nature of the pastoral counseling relationship may give rise to a legal duty."

Cal.App.2d 141 [60 P.2d 492]; see also *Estate of Brown* (1948) 89 Cal.App.2d 496 [200 P.2d 888].)

In *Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092 [252 Cal.Rptr. 122, 762 P.2d 46] (*Molko*), our Supreme Court analyzed the extent to which the religion clauses permit a religious organization to be exposed to tort liability. Though the case did not involve an alleged fiduciary relation, the *Molko* court's analysis is far more consistent with the view of courts that have allowed actions for tort liability against religious officers whose sexual misconduct was claimed to have breached a fiduciary duty than that of courts finding such actions barred by the First Amendment. For this reason, we conclude that there are circumstances in which the religion clauses of the state and federal Constitutions would pose no impediment to the imposition of a fiduciary duty on a pastor whose sexual misconduct breaches a confidential relation with a parishioner.

*Molko* was an action for fraud, intentional infliction of emotional distress, false imprisonment, and restitution against the Unification Church by former members who had left the church after going through a "deprogramming" process. The action was based on alleged misrepresentations by church members during the initial recruitment of plaintiffs as to the organization's religious affiliations, and on threats of divine retribution and other allegedly coercive activities after the plaintiffs became members. The trial court granted the church's motion for summary judgment. A unanimous panel of this court affirmed that ruling, because we believed the plaintiffs could not pursue their tort claims without offending the church's rights under the free exercise clause of the First Amendment. The Supreme Court found no such problem, however, and reversed our decision.

Noting that "judicial sanctioning of tort recovery constitutes state action sufficient to invoke the same constitutional protections applicable to statutes and other legislative actions" (*Molko, supra,* 46 Cal.3d at p. 1114, citing *New York Times v. Sullivan* (1964) 376 U.S. 254, 265 [84 S.Ct. 710, 718, 11 L.Ed.2d 686, 95 A.L.R.2d 1412]), the court set forth the applicable constitutional principles: "The religion clauses protect only claims rooted in religious belief. (*Wisconsin* v. *Yoder*[, *supra,*] 406 U.S. 205, 215 . . . .) . . . [¶] However, while religious *belief* is absolutely protected, religiously motivated *conduct* is not. (*Sherbert* v. *Verner* (1963) 374 U.S. 398, 402-403 [10 L.Ed.2d 965, 969-970, 83 S.Ct. 1790]; *People* v. *Woody* (1964) 61 Cal.2d 716, 718 [40 Cal.Rptr. 69, 394 P.2d 813].) Such conduct 'remains subject to regulation for the protection of society.' (*Cantwell* v. *Connecticut* [(1940)] 310 U.S. [296,] 304 [60 S.Ct. 900, 903, 84 L.Ed. 1213].) Government action burdening religious conduct is subject to a balancing test, in which the

importance of the state's interest is weighed against the severity of the burden imposed on religion. (*Wisconsin* v. *Yoder, supra,* 406 U.S. at p. 214 [32 L.Ed.2d at p. 24].) The greater the burden imposed on religion, the more compelling must be the government interest at stake. [Citations.] A government action that passes the balancing test must also meet the further requirements that (1) no action imposing a lesser burden on religion would satisfy the government's interest and (2) the action does not discriminate between religions, or between religion and nonreligion."[8] (*Braunfield v. Brown* (1961) 366 U.S. 599, 607 [6 L.Ed.2d 563, 568-569, 81 S.Ct. 1144].)" (*Molko,* at pp. 1112-1113, italics in original.)

Applying these principles to the plaintiffs' fraud claim, the Supreme Court determined that the trial court could, without questioning the authenticity and force of the Unification Church's religious teachings, accept the view of the plaintiffs' experts that the plaintiffs did not willingly submit to the religious teachings of the Unification Church because the psychological techniques of the church deprived them of the ability to reason critically and make independent judgments. (*Molko, supra,* 46 Cal.3d at p. 1115.) According to the Supreme Court, "liability for fraud in the case at bar would burden no one's right to believe and no one's right to remain part of his religious community . . . ." (*Id.* at p. 1116.) The court concluded that the state's interest in allowing tort liability for the church's deceptive practices outweighed any burden such liability would impose on the church's religious conduct, and no less restrictive alternative was available. (*Id.* at pp. 1117-1118.)

Noting that "in appropriate cases courts will recognize tort liability *even for acts that are religiously motivated*"[9] (*Molko, supra,* 46 Cal.3d at p. 1114,

---

[8]Justice Brennan has questioned the validity of the conventional judicial distinction between religious beliefs and religious conduct, once noting that "for purposes of defining the protection afforded by the Free Exercise Clause a sharp distinction cannot be made between a religious belief and religiously motivated action . . . ." (*McDaniel v. Paty* (1977) 435 U.S. 618, 631, fn. 2 [98 S.Ct. 1322, 1330, 55 L.Ed.2d 593] (conc. opn. of Brennan, J.).) Similarly, Professor Tribe has pointed out that "[i]t is somewhat peculiar . . . that the distinction between belief and action would arise at all in the free exercise context, for the guarantee refers explicitly to the *exercise* of religion and would thus seem to extend by its own terms beyond thought and talk." (Tribe, American Constitutional Law (1978) § 14-8, at p. 838, fn. 13, italics in original.) The fundamental assumption that "religion," and therefore a "religious belief," are amenable to judicial definition also has been questioned. (See Freeman, *The Misguided Search for the Constitutional Definition of "Religion"* (1983) 71 Geo. L.J. 1519.)

[9]In support of this statement, the court cited *O'Moore v. Driscoll* (1933) 135 Cal.App. 770, 778 [28 P.2d 438] (allowing priest's action against his superiors for false imprisonment as part of their effort to obtain his confession of sins); *Bear v. Reformed Mennonite Church* (1975) 462 Pa. 330 [115 P.2d 977, 136 A.L.R. 1291] (allowing action for interference with

italics added), the court endorsed the view that religious organizations (and, by implication, members of the clergy) may be held liable for intentional torts where liability can be adjudicated on the basis of neutral principles requiring no inquiry into the validity of a religious belief or practice. This view is consistent with that of the United States Supreme Court (see, e.g., *United States v. Ballard* (1944) 322 U.S. 78 [64 S.Ct. 882, 88 L.Ed. 1148]), and the widespread common law rejection of the "charitable immunity" from tort liability the clergy once enjoyed.[10]

The *Molko* court acknowledged that the Unification Church's recruitment practices "were the product of sincerely held [religious] beliefs" (*Molko, supra,* 46 Cal.3d at p. 1115), and that subjecting such conduct to tort liability would "discourage the Church from putting such belief into practice." (*Id.* at p. 1117.) Emphasizing the compelling state interest in protecting persons against deceptive religious recruitment practices, the court found the burden imposed by tort liability "not substantial" despite the fact that "it potentially closes one questionable avenue for bringing new members into the Church." (*Ibid.*)

Unlike a church's recruitment practices, a pastor's sexual misconduct is not likely to be defended on the basis of any sincerely held religious belief or practice. Subjecting such secular conduct to tort liability therefore would not ordinarily discourage a religious organization from putting its beliefs into practice. Moreover, the sexual exploitation of parishioners by pastors with whom they have a confidential relation poses a threat to public safety, peace or order that is seemingly as substantial as that posed by deceptive religious recruitment practices, and the state possesses at least as compelling an interest in discouraging such exploitation. We are aware of no action imposing a lesser burden on religion than tort liability that would satisfy the government's interest in discouraging the sexual abuse of parishioners by

marriage and business interests when church ordered congregation to "shun" former member); *Carrieri v. Bush* (1966) 69 Wash.2d 536 [419 P.2d 132] (allowing action for alienation of affections when pastor counseled woman to leave husband who was "full of the devil"); *Candy H. v. Redemption Ranch, Inc.* (M.D.Ala. 1983) 563 F.Supp. 505, 516 (allowing action for false imprisonment against religious group); and *Van Schaick v. Church of Scientology of Cal., Inc.* (D.Mass. 1982) 535 F.Supp. 1125, 1135 ("[c]auses of action based upon some proscribed conduct may, thus, withstand a motion to dismiss even if the alleged wrongdoer acts upon a religious belief or is organized for a religious purpose").

[10]The common law of most states is now consistent with the Restatement view that "one engaged in a charitable, educational, religious, or benevolent enterprise or activity is not for that reason immune from tort liability." (Rest.2d Torts (1977) § 895E; see *id.,* coms. b & c, pp. 421-422; see Caldeira, *Changing the Common Law: Effects of the Decline of Charitable Immunity* (1981-1982) 16 L. & Soc'y Rev. 669.)

pastors with whom they stand in a confidential relation. ▪ ▪ Finally, the imposition of liability for the sexual misconduct of pastors that breaches a fiduciary duty would not discriminate between religions (or between religion and nonreligion)[11] any more than the imposition of liability for religious recruitment practices; and there is reason to think that, as between religions, it would have a lesser discriminatory effect.[12]

 It also bears noting that the *Molko* court viewed the intentional infliction of emotional distress claim in that case as akin to a claim for breach of a fiduciary duty. With respect to the emotional distress claim, the court stated as follows: "Viewed in the light most favorable to plaintiffs, the Church's continued deceptions might well be seen as conduct breaching plaintiffs' trust in the integrity of those who were promising to make their lives more meaningful. So viewed, the Church's actions might well constitute an abuse of 'a relation or position which gives [the Church] power to damage the plaintiff's interest.'" (*Molko, supra*, 46 Cal.3d at pp. 1122-1123.)

The *Molko* court's analysis of the extent to which the free exercise and establishment clauses bar tort claims against religious organizations cannot be squared with respondents' contention, which the trial court appears to have accepted, that constitutional considerations bar the imposition of tort liability here "in these *or any other circumstances*" (italics added), *regardless* of the nature of the relationship between the pastor and parishioner. Accordingly, we conclude that a pastor may be subject to tort liability for sexually inappropriate and injurious conduct that breaches a fiduciary duty arising out of a confidential relation with a parishioner, *provided* the alleged injurious conduct was not dictated by a sincerely held religious belief or carried out in accordance with established beliefs and practices of the religion to which the pastor belongs, and there is no other reason the issues cannot be framed for the trier of fact in secular rather than sectarian terms.[13]

---

[11]"[T]he First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." (*Epperson v. Arkansas* (1968) 393 U.S. 97, 104 [89 S.Ct. 266, 270, 21 L.Ed.2d 228].)

[12]Studies indicate that although the sexual misconduct of clergy is a greater problem in some religions than others, it is a nondenominational problem shared to varying degrees by all religions. (See, e.g., *Clergy Sexual Misconduct, supra*, 7 St. Thomas L.Rev. at pp. 33-34.)

[13]This conclusion does not conflict with *Jacqueline R. v. Household of Faith Family Church, Inc., supra*, 97 Cal.App.4th 198. Though the alleged sexual activities of the defendant pastor in that case occurred in the context of marital counseling, the court's conclusion that the pastor "did not owe plaintiffs the same independent duty of care required of licensed professionals" (*id.* at p. 207) was decided entirely on the basis of *Nally*. The court went out of its way to emphasize that "[w]e have not considered whether a confidential relationship

## D.

▮ Though respondents do not justify Reverend Namocatcat's conduct on the basis of any belief or practice of the Roman Catholic Church, appellant presents a factual question that cannot be addressed in secular terms.

Two aspects of this case distinguish it from all others in which a pastor-parishioner relationship was found to create a fiduciary duty. The first is appellant's failure to allege that Reverend Namocatcat's exploitation of her alleged vulnerability arose in the context of a counseling relationship. It is telling that the cases imposing a fiduciary duty on a pastor for sexual misconduct that breached a confidential relation all involved situations in which the pastor was providing the parishioner marital, family or financial counseling.[14] Unless the alleged misconduct is defended on religious grounds, such a counseling relationship usually obviates the need for a constitutionally impermissible inquiry into religious beliefs or practices, as would be required for some other pastor-parishioner relations, such as a confessional relationship.

If the failure to allege a counseling relationship were the only deficiency of the complaint we might be willing to provide appellant an opportunity to amend, as this problem was never brought to appellant's attention by respondents or the trial court, and the complaint does not show on its face that the necessary amendment cannot be made. (*Temescal Water Co. v. Department of Public Works* (1955) 44 Cal.2d 90, 107 [280 P.2d 1].) The complaint does, however, suffer another deficiency, and it *is* one that clearly cannot be cured by amendment.

Instead of alleging any of the reasons conventionally relied upon to show that a party to an alleged confidential relation is in a vulnerable position—namely, "advanced age, or youth, or lack of education, or ill health, or mental weakness" (Bogert, Trusts & Trustees, *supra*, § 482, at pp. 293-298, fns. omitted)—appellant instead relies on her piety. The theory of the complaint is that Reverend Namocatcat "stood in a . . . fiduciary relationship with [appellant] and thus owed her the highest duty of care and good

---

existed between the pastor and plaintiffs which may have given rise to an independent legal duty because the parties did not tender the issue." (*Ibid.*)

[14]See *Doe v. Evans, supra,* 814 So.2d 370 (marital counseling); *F.G. v. MacDonell, supra,* 150 N.J. 550 [696 A.2d 697] (pastoral counseling); *Destefano v. Grabrian, supra,* 763 P.2d 275 (marital counseling); *Sanders v. Casa View Baptist Church, supra,* 898 F.Supp. 1169, 1173 (marital counseling); *Moses v. Diocese of Colorado, supra,* 863 P.2d 310, 316 (counseling regarding relationship with child); *Erickson v. Christenson, supra,* 781 P.2d 383, 384 ("counseling relationship"); *Adams v. Moore, supra,* 385 S.E.2d 799 (financial counseling).

faith . . ." merely "by virtue of his position as a Roman Catholic Priest, and as pastor and priest to [appellant] a member of his congregation," who was "deeply religious." According to the complaint, Reverend Namocatcat was the regnant party to the relationship because he knew appellant's piety made her "readily subject to manipulation and control by a pastor, and her judgment and ability to resist . . . his advances [would be] substantially compromised by her religious faith and trust." Appellant's claim that the depth of her religious faith rendered her vulnerable to Reverend Namocatcat could not be adjudicated without reference to the nature of her religious beliefs and the doctrines of her church.

*Langford v. Roman Catholic Diocese of Brooklyn, supra,* 677 N.Y.S.2d 436 illustrates the constitutional problem presented by appellant's theory of vulnerability. When the plaintiff-parishioner in *Langford* was diagnosed with multiple sclerosis she " 'looked to God for direction' " and sought the assistance of the defendant priest. The priest visited the plaintiff three and four times a week and encouraged her dependence on him "by emphasizing the mystical and esoteric nature of his power to cure her." (*Id.* at p. 437.) The plaintiff claimed she lacked the power to resist the defendant's sexual advances because "she 'was addicted to him and the [religious] power he possessed to halt the spread of the multiple sclerosis . . . [she believed that if she angered him, she] would lose her lifeline to God and continued health.' " (*Id.* at pp. 437-438.) The court granted summary judgment for the priest and his diocese on the ground that the adjudication would necessitate a constitutionally impermissible inquiry into religious doctrine: "The insurmountable difficulty facing plaintiff, this court holds, lies in the fact that it is impossible to show the existence of a fiduciary relationship without resort to religious facts. In order to consider the validity of plaintiff's claims of dependency and vulnerability, the jury would have to weigh and evaluate, *inter alia,* the legitimacy of plaintiff's beliefs, the tenets of the faith insofar as they reflect upon a priest's ability to act as God's emissary and the nature of the healing powers of the church. To instruct a jury on such matters is to venture into forbidden ecclesiastical terrain. On the other hand, if we try to salvage plaintiff's claim by stripping her narrative of all religious nuance, what is left makes out a cause of action in seduction—a tort no longer recognized in New York—but not in breach of a fiduciary duty." (*Id.* at p. 439, fns. omitted.)

Unlike the plaintiff in *Langford,* whose vulnerability arose not simply from her religious devotion, but also from a grave physical ailment, appellant's claim of vulnerability rests *solely* on her "deeply religious" disposition. Thus the crucial questions whether appellant was vulnerable to Reverend Namocatcat and unable to protect herself effectively would focus

sharply on the nature and depth of her religious faith, and its basis, if any, in Roman Catholic doctrine. These are, of course, profoundly religious questions, as to which the courts may not constitutionally inquire.

Appellant cannot avoid the problem by an amendment to the complaint omitting the assertion that her religiosity rendered her vulnerable to Reverend Namocatcat because that would defeat her assertion that they stood in a confidential relation. Without that fiduciary claim, appellant would be left with no more than a claim for seduction, which is statutorily barred, or a claim that the sacerdotal celibacy mandated by the Roman Catholic Church (Code of Canon Law (1983) Canon 277) is judicially enforceable, which is constitutionally untenable. (*Torcaso v. Watkins* (1961) 367 U.S. 488, 495 [81 S.Ct. 1680, 1683-1684, 6 L.Ed.2d 982].)

Nor, if granted leave to amend, could appellant replace the constitutionally impermissible basis of her claimed vulnerability with a different disability. ■■■ As noted in *Continental Ins. Co. v. Lexington Ins. Co.* (1997) 55 Cal.App.4th 637 [64 Cal.Rptr.2d 116], " '[a] plaintiff may not discard factual allegations of a prior complaint, or avoid them by contradictory averments, in a superseding, amended pleading.' " (*Id.* at p. 646, quoting *California Dental Assn. v. California Dental Hygienists' Assn.* (1990) 222 Cal.App.3d 49, 53, fn. 1 [271 Cal.Rptr. 410]; accord, *Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 946 [29 Cal.Rptr.2d 669].) Given the centrality to appellant's case of her problematic theory of vulnerability, it is inconceivable the trial court would accept any effort to omit it by amendment.

As Reverend Namocatcat's demurrer could have been sustained without leave to amend on this ground, we shall affirm the judgment as to that respondent.

### Duty of the Archdiocese

Appellant does not attempt to hold respondent Archdiocese vicariously liable under the theory of respondeat superior,[15] but directly liable for breach of a fiduciary duty and for negligence in hiring and supervision. In order to

---

[15]Appellant presumably did not do so because Reverend Namocatcat's alleged sexual misconduct violated the vow of celibacy compelled by the Roman Catholic Church, and therefore was not within the scope of his employment. (See, e.g., *Destefano v. Grabrian, supra,* 763 P.2d 275, 287 ["When a priest has sexual intercourse with a parishioner it is not part of the priest's duties nor customary within the business of the church. Such conduct is contrary to the principles of Catholicism and is not incidental to the tasks assigned a priest by the diocese"]; *Byrd v. Faber* (1991) 57 Ohio St.3d 56, 59-60 [565 N.E.2d 584, 588, 5 A.L.R.5th 1115] [doctrine of respondeat superior inapplicable because "Seventh-day Adven-

prevail against the Archdiocese, however, appellant must show, among other things, that she suffered an injury the law recognizes. For the reasons we have explained, appellant cannot make such a showing; accordingly, there is no need to inquire whether the Archdiocese can be subjected to any duty. The Archdiocese's demurrer could on this ground have been properly sustained without leave to amend.

## V. DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.

Haerle, J., and Lambden, J., concurred.

On March 17, 2003, the opinion was modified to read as printed above.

---

tist organization in no way promotes or advocates nonconsensual sexual conduct between pastors and parishioners"]; see also Rest.2d Agency (1957) § 216; but see also Rest.2d Torts, § 317, defining the duty of a master to control the conduct of a servant acting outside the scope of his employment.)