Kimberly Ann GAINES, an individual, and William Samuel Gaines, individually and in his capacity as Personal Representative for the Estate of William Robert Gaines, Plaintiffs,

v.

Reverend Henry R. KRAWCZYK, United States Conference of Catholic Bishops, Roman Catholic Diocese of Pittsburgh, St. Maximilian Kolbe Parish, St. Anne Catholic Church, Our Lady of Joy Parish and John Doe Nos. 1–10, Defendants.

No. CIV.A. 03–1957.

United States District Court, W.D. Pennsylvania.

Nov. 18, 2004.

Benjamin Wood, Christopher Hellmich, Read McCaffrey, Washington, DC, for Stephen H. Sherman.

Dennis St. John Mulvihill, Rhonda J. Sudina, Robb, Leonard & Mulvihill, Pittsburgh, PA, for Reverand Henry R. Krawczyk.

C. Clark Hodgson, Jr., Patricia Casperson, William T. Mandia, Stradley Ronon Stevens & Young, Philadelphia, PA, for U.S. Conference of Catholic Bishops.

Joseph W. Selep, Zimmer Kunz, Pittsburgh, PA, for Roman Catholic Diocese of Pittsburgh.

## OPINION

CERCONE, District Judge.

Plaintiffs commenced this action pursuant to Pennsylvania's Wrongful Death and Survival Acts seeking redress for the death of their son, William Robert Gaines ("Gaines"). In the early morning hours of June 18, 2003, Gaines, after consuming

alcohol, fell from a crawlspace in the attic of a local catholic church and plummeted approximately twenty-five feet through the ceiling of the church sanctuary and onto a pew, sustaining skull and spinal injuries that resulted in his death. Plaintiffs' complaint contains the following causes of action: negligence, employer negligence, negligent entrustment, breach of fiduciary duty, fraud and civil conspiracy. Presently before the court are motions by the institutional defendants seeking to dismiss various counts of the complaint and certain requested damages. For the reasons set forth below, the motions will be granted in part and denied in part.

It is well-settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). Dismissal of a complaint is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Langford v. City of Atlantic City,* 235 F.3d 845, 847 (3d Cir. 2000) (*citing Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996)). The question is not whether the plaintiff will ultimately prevail; instead, it is whether the plaintiff can prove any set of facts consistent with the averments of the complaint which would show the plaintiff is entitled to relief. *Jordan v. Fox. Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). Under this standard a complaint will be deemed sufficient if it adequately puts the defendant on notice of the essential elements of a cause of action. *Nami,* 82 F.3d at 66.

While all factual allegations and reasonable inferences to be drawn therefrom are to be accepted as true, "a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion School District,* 132 F.3d 902, 906 (3d Cir. 1997) (citations omitted). In ruling on a 12(b)(6) motion courts consistently have rejected "legal conclusions," "unsupported conclusions," "unwarranted inferences," "unwarranted deductions," "footless conclusions of law" or "sweeping legal conclusions cast in the form of factual allegations." *Id.* at n. 8 (*citing in support* Charles Allen Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed.1997), *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996) ("while the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice") and *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993) ("Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.")).

Gaines enrolled in the University of Pittsburgh as a freshman in the fall of 2002. He was a talented athlete and a gifted football player, having enjoyed success while playing football in high school. Gaines made the football team and received playing time during his freshman season. During this time Gaines and his roommate, David Abdul, lived in an apartment along with several of their teammates.

In the spring of 2002, Gaines came to know defendant Krawczyk, who was the pastor of defendant St. Maximilian Kolbe Parish and priest of defendant St. Anne Catholic Church in Homestead, Pennsylvania and had been the pastor and priest of these institutions since October of 1992. Complaint at ¶¶ 6,7,16 & 21. In the spring of 2002 defendant Krawczyk purchased al-

coholic beverages for Gaines, who was then eighteen years of age, and consumed alcoholic beverages with Gaines. *Id.* at ¶ 21. During the spring of 2002 Krawczyk purchased alcohol for Gaines on more than one occasion, and on at least one night Krawczyk drove Gaines home while Krawczyk was under the influence of alcohol. *Id.*

In the summer of 2002, Gaines went to work for Krawczyk performing landscaping work at St. Anne Catholic Church. During the summer Krawczyk served illegal beverages to Gaines and other individuals under the age of twenty-one on at least one additional occasion. *Id.* at ¶ 23. Gaines returned to the University of Pittsburgh in the fall of 2002 as a sophomore and member of the football team.

In May of 2003, after the completion of Gaines's sophomore year, a fire occurred in the apartment where he and several of his teammates were living. *Id.* at ¶ 24. The fire was extensive and as a result the occupants were forced to make other living arrangements. Gaines and his roommate, David Abdul, accepted an offer from Krawczyk to live in a convent on the grounds of St. Anne Catholic Church. *Id.* at ¶ 24. Gaines and Abdul agreed to pay monthly rent in the amount of $50.00 and moved to the convent in late May of 2003. *Id.* at ¶ 24. Krawczyk also lived on the grounds at St. Anne Catholic Church, and various employees of the defendant Diocese of Pittsburgh had actual knowledge that Gaines and Abdul had moved in to the convent. *Id.* at ¶ 25.

During the first three weeks that Gaines and Abdul lived in the convent Krawczyk served alcohol to them on multiple occasions. *Id.* at ¶ 26. On at least one occasion alcohol was furnished to a number of Gaine's teammates, all of whom were also minors. *Id.* at ¶ 27. During this time Gaines commented to a friend on at least one occasion that he felt pressured to drink with Krawczyk because Krawczyk was providing Gaines with a place to live and he did not want to show disrespect. *Id.* at ¶ 28.

On the evening of June 16, 2003, Krawczyk served alcohol to Gaines and Abdul and consumed alcohol with them. Each consumed several mixed drinks. They also viewed a video tape together which contained pornographic materials. *Id.* at ¶ 29. Later than evening, Krawczyk took Gaines and Abdul up two flights of stairs to a utility room where they gained access to a window that led out onto the rectory roof. Krawczyk used a key to unlock the door to the utility room. After spending time on the rectory roof, the three returned to the church and as they did so Krawczyk did not relock the door to the utility room. *Id.* at ¶ 29. Inside the utility room there was a short ladder that provided access to a crawl space in the attic of the church. *Id.* at ¶ 29.

Krawczyk planned and hosted a cook-out at the church on the evening of June 17, 2003. Gaines, age nineteen, David Abdul, age nineteen, John Simonitis, age eighteen, Stephen Buches, age nineteen, Joseph Villani, age nineteen, and Neil Tracey, age nineteen, attended the cook-out. *Id.* at ¶ 30. Krawczyk served alcohol to Gaines and his teammates, knowing they were under the age of twenty-one. *Id.* Krawczyk served each of the minors numerous alcoholic beverages and consumed several himself, at one point even challenging the college football players to a drinking competition. *Id.* at ¶ 31. Gaines consumed numerous drinks that evening. *Id.* at ¶ 32. During the evening a television was displaying the programming on the Playboy Channel in the presence of the teenagers and Krawczyk. *Id.* at ¶¶ 32 & 33. During the evening Krawczyk spoke to the teenagers about religion and the catholic church, as he had done in the past. *Id.* at ¶ 34.

In the early morning hours of June 18, 2003, Gaines, Abdul and Simonitis used the microphone in the church sanctuary in a manner that revealed their obvious intoxication. One of the other teenagers objected to this behavior as inappropriate, but Krawczyk did nothing to stop it. *Id.* at ¶ 35.

After engaging in such conduct, Gaines and Abdul decided to take Simonitis up to the rectory roof and advised Krawczyk of their intent to do so. They also tried to convince Buches to accompany them to the roof in front of Krawczyk, but Buches declined. *Id.* at ¶ 36. Krawczyk did not discourage any of the teenagers from going out on to the roof. Gaines, Abdul, and Simonitis proceeded to the utility room, went out on the rectory roof, and returned to the utility room without incident. Krawczyk heard the teenagers upstairs in the utility room and had a brief conversation with Tracey about them being up there. *Id.* at ¶ 37. After re-entering the utility room from the rectory roof, Gaines and Abdul climbed up the short ladder that led to the crawlspace in the attic area. Gaines and Abdul entered the crawlspace and crawled out over the ceiling of the church sanctuary. *Id.* at ¶ 38. The two decided to turn around and return to the utility room, and as Gaines attempted to do so he fell from the crawlspace, crashed through the ceiling of the church sanctuary and struck a pew approximately twenty-five feet below. *Id.* at ¶ 38. Gaines suffered head and spinal injuries, which resulted in his death at 11:00 p.m. on June 18, 2003. *Id.* at ¶ 40.

Krawczyk had a history of engaging in conduct that reflected a propensity to corrupt the morals of minors. In the 1980's while Krawczyk was the parochial vicar at defendant Our Lady of Joy Parrish in Plum, Pennsylvania, he served alcohol to minors on a number of occasions, and this conduct became known to a number of employees at that parish. *Id.* at ¶ 12. These employees also became aware of behavior that led them to believe that Krawczyk had acted in a sexually inappropriate manner towards minors while he was employed at Our Lady of Joy Parish. *Id.* at ¶ 12. During this time Krawczyk was accused on at least one occasion of furnishing alcohol and illegal controlled substances to minors and of making a sexual advance on a minor boy. Krawczyk acknowledged furnishing alcohol to a minor on at least one occasion, and was reprimanded by defendant Diocese of Pittsburgh for his illegal conduct. *Id.* at ¶ 13. Thereafter, the Diocese of Pittsburgh sent Krawczyk for psychological evaluation and counseling, but permitted him to retain his position as priest and parochial vicar of Our Lady of Joy Parish. This decision was made after the family of one of the accusers complained that Krawczyk might repeat his behavior. Notwithstanding the allegations of inappropriate conduct involving minors, Bishop Wuerl, acting on behalf of defendant Roman Catholic Diocese of Pittsburgh, specifically approved and/or directed Krawczyk's transfer in June of 1988 from Our Lady of Joy Parish to St. Therese of Lisieux Parish in Munhall, Pennsylvania, where Krawczyk also served as parochial vicar. *Id.* at ¶ 14. The Diocese of Pittsburgh and defendant United States Conference of Catholic Bishops did not reveal or make known the fact that Krawczyk had admitted furnishing alcohol to minors and had been accused of sexually inappropriate behavior involving a minor at any time between the first incident in 1986 and the date of Gaines's death in June of 2003. *Id.* at ¶ 15.

Krawczyk was promoted to serve as pastor of St. Maximilian Kolbe Parish on October 27, 1992. *Id.* at ¶ 16. Within a month Krawczyk was accused of furnishing alcohol to minors, including serving alcohol to a teenage male. The Diocese of

Pittsburgh had knowledge of at least one of the new accusations, and again reprimanded Krawczyk. Nevertheless, it permitted Krawczyk to retain his position as pastor of St. Maximilian Kolbe Parish and continue to have contact with minors in that capacity. *Id.* at ¶ 17. The Diocese of Pittsburgh and the United States Conference of Catholic Bishops did not make known to the public that Krawczyk had repeatedly been accused of furnishing alcohol to individuals under the age of twenty-one. *Id.* at ¶ 18.

Defendants Roman Catholic Diocese of Pittsburgh, St. Maximillan Kolbe Parish, St. Anne Catholic Church and Our Lady of Joy Parish ("the institutional defendants") have answered Counts I through IV of the complaint, which plead wrongful death and survival actions in negligence and employer negligence based on Krawczyk's duty to refrain from furnishing alcohol to Gaines. They contend, however, that the remaining causes of action for negligent entrustment, breach of fiduciary duty, fraud and civil conspiracy should be dismissed. The United States Conference of Catholic Bishops also moves to dismiss the fraud and civil conspiracy counts on both jurisdictional and substantive grounds.

The institutional defendants move to dismiss the causes of action for "negligent entrustment" set forth at Counts V and IV, contending that a cause of action for negligent entrustment is limited to situations involving an instrumentality such as a gun or motor vehicle, and the negligent operation thereof, and in any event the allegations in these counts are duplicative of those set forth in the causes of action for employer negligence at Counts III and IV. Plaintiffs contend that the institutional defendants negligently entrusted Krawczyk to operate the St. Maximilian Kolbe Parish and St. Anne Catholic Church with knowledge that he had repeatedly furnished alcohol to minors and had been accused of making an inappropriate sexual advance toward a minor on at least one occasion, thereby creating an unreasonable risk of harm to the minors within the congregation and the community of Homestead who were exposed to Krawczyk by virtue of his position, which eventually included Gaines.

■ The institutional defendants' attempt to dismiss the negligent entrustment counts is without merit. Defendants have advanced no authority to support the proposition that negligent entrustment is limited solely to circumstances involving the use of an instrumentality. To the contrary, Pennsylvania has adopted the Restatement (Second) of Torts § 308, which defines negligent entrustment to include engaging in an activity that is under the control of the actor. *See Ferry v. Fisher,* 709 A.2d 399, 403 (Pa.Super.1998) (*quoting* Restatement (Second) of Torts § 308 (1979)). It is sufficiently alleged that the institutional defendants were aware of Krawczyk's propensity to furnish alcohol to minors in his position as a priest, and knew or should have known that an unreasonable risk of harm to individuals under the age of twenty-one would be created by permitting Krawczyk to retain his position as pastor of the St. Maximilian Kolbe Parish and priest of the St. Anne Catholic Church. The alleged knowledge of such a propensity in conjunction with the institutional defendants' control over Krawczyk's ability to retain a position permitting unsupervised exposure to such individuals is sufficient to withstand the instant motion to dismiss. *See Christiansen v. Silfies,* 446 Pa.Super. 464, 472–73, 667 A.2d 396 (1995) (" § 308 imposes liability on a defendant because of her own acts in relation to an instrumentality or activity under her control; an 'entrustor's' liability is not dependent on, derivative of, or imputed from

the 'entrustee's' actual liability for damages.") (citations omitted).[1]

■ Moreover, defendants' contention that Counts V and VI are duplicative of the causes of action set forth in Counts III and IV is unavailing. Under the Federal Rules of Civil Procedure a party may set forth alternative statements of a claim or defense and may state all separate claims and defenses available regardless of consistency and jurisdictional origin. Fed. R.Civ.P. 8(e)(2). It follows that the institutional defendant's motion to dismiss the negligent entrustment counts must be denied.

The moving defendants contend that plaintiffs' claims for breach of a fiduciary duty should be dismissed because in general courts have recognized that the relationship between a minister and a parishioner is not a fiduciary one, and plaintiffs do not allege an injury from a fiduciary relationship. Specifically, they contend that the cognizable relationships between Gaines and Krawczyk are in themselves insufficient to create a fiduciary duty between Krawczyk and Gaines, and plaintiffs do not seek to establish an injury based upon a relationship that potentially could give rise to such a duty.

Plaintiffs rejoin by asserting that determining whether a fiduciary or confidential relationship exists involves a fact intensive inquiry into the totality of the circumstances surrounding the parties' interaction, and their general allegations concerning 1) Gaine's religious commitment; 2) Gaines' trust for members of the clergy; 3) Krawczyk's position as a priest; 4) the difference in age between Krawczyk and Gaines; and 5) the landlord/tenant relationship between the two provide a suffi-

cient basis to support findings that Krawczyk had "over mastering influence" over Gaines and Gaines "justifiably reposed" enormous trust in Krawczyk as a priest. These interactions, plaintiffs assert, are sufficient to prove there was a sense of obligation or dependence by Gaines, and the formation of a confidential relationship wherein Krawczyk could be found to have exercised overmastering influence over Gaines.

Relying on equity cases arising in probate settings, plaintiffs advance in support of their position that Pennsylvania law on "confidential relationships" is malleable enough to encompass their contention that a relationship was formed that could have given rise to a fiduciary duty. They note the Supreme Court of Pennsylvania has held that a confidential relationship exists "as a matter of fact whenever one party has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering prominence on one side, or weakness, dependence or justifiable trust, on the other." *In re Estate of Clark*, 467 Pa. 628, 359 A.2d 777, 781 (1976). Such a relationship exists whenever the law recognizes that "a party is bound to act for the benefit of another, and can take no advantage to himself." *Frowen v. Blank*, 493 Pa. 137, 425 A.2d 412, 416–17 (1980). Thus, "when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed" the basis for an unfair advantage is created. *Id.*

---

1. Pennsylvania law limits liability for negligent entrustment to cases where the entrustee engages in the activity negligently and is found to be causally responsible for the ensuing harm. *Christiansen*, 667 A.2d at 400.

Here, plaintiffs have alleged primary negligence against Krawczyk in Counts I and II, thus providing a basis to support the necessary findings.

■ Where such a relationship exists, equity raises a presumption against the validity of the transactions between the parties, and casts on the party seeking to defend the transaction the burden of fairness, honesty and integrity. *In the Matter of the Estate of Evasew*, 526 Pa. 98, 584 A.2d 910, 912 (1990). In meeting that burden the proponent must demonstrate that there was no abuse of confidence, he acted in good faith, and the act by which he is benefited was free, voluntary, and independent. *Id.* The Supreme Court of Pennsylvania has explained:

It has been held that where the relations between contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality, but that from one party's superior knowledge of the matter derived from a fiduciary relationship, or from overmastering influence, weakness, dependence, or trust justifiably reposed, unfair advantage in the transaction is made probable, the transaction is presumed void, and the burden is shifted to, and is incumbent upon, the stronger party to show affirmatively that no deception was practiced and that all was fair, open, voluntary, and well understood. It is said that a fiduciary seeking to profit by a transaction with one who confided in him has the burden of showing that he communicated to the other, not only the fact of his interest in the transaction, but all information he had which it was important for the other to know in order to enable him to judge the value of his property. Thus, if any transaction between the parties who stand in a relationship of trust and confidence, the party in whom the confidence is reposed obtains an apparent advantage over the other, he is presumed to have obtained that advantage fraudulently; and if he seeks to support the transaction, he must assume the burden of proof that he has taken no advantage of his influence or knowledge and that the arrangement is fair and conscientious.

*Id.* at 912–13. Thus, where the relationship between the parties is one of trust and confidence, the party in whom the trust and confidence is reposed "must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage." *Id.* at 913 ("quoting *Young v. Kaye*, 443 Pa. 335, 279 A.2d 759, 763 (1971)).

■ The Supreme Court of Pennsylvania has further observed that "it is impossible to define precisely what constitutes a confidential relationship." *Id.* (additional citations omitted). It is not limited to a particular association of persons or confined to technical cases of fiduciary relationship, but is deemed to be present whenever the relative positions of the parties is such that one has the power and means to take advantage or exercise undue influence over the other. *Id.* Such a relationship is routinely recognized "between trustees and *cestui que trust*, guardian and ward, attorney and client, and principal and agent." *Id.*

Plaintiffs extrapolate from this body of law that a claim for breach of fiduciary duty can be maintained based essentially on Gaines' religious beliefs, his respect for Krawczyk and Krawczyk's propensity and willingness to serve alcohol to Gaines. In other words, Gaines' deeply religious convictions coupled with his respect for the clergy in general and his respect for Krawczyk in light of his generosity in particular, sufficiently identifies the existence of a fiduciary relationship; and Krawczyk's pressuring Gaines to drink with him sufficiently will support a breach of the confidence reposed as a consequence of that relationship.

■ Plaintiffs' allegations and arguments raise the question of whether Pennsylvania would recognize a cause of action for breach of fiduciary duty under the circumstances presented. Plaintiffs failed to cite any appellate authority for the extension of Pennsylvania law in such a manner. In resolving this question we must predict whether the Supreme Court of Pennsylvania would recognize such a cause of action in the setting presented by this case. *See Wiley v. State Farm Fire and Casualty Co.*, 995 F.2d 457, 459 (3d Cir. 1993) (in the absence of established precedent on an issue of state law, the district court must predict how the Pennsylvania Supreme Court would rule if it were presented with the question); *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 349 (3d Cir.2001) (in the absence of state appellate authority directly addressing the issue raised, "we must don the soothsayer's garb and predict how [the Supreme Court of Pennsylvania] would rule if it were presented with the question."). In making this prediction it is appropriate to consider decisions of the state intermediate appellate courts, federal courts interpreting the particular area of the law in question, and other state supreme courts that have addressed the matters raised. *Wiley*, 995 F.2d at 459–60; *Buczek v. Continental Casualty Ins. Co.*, 378 F.3d 284, 288 n. 2 (3d Cir.2004).

■ After considering the various sources of authority bearing on issue, we conclude that the Pennsylvania Supreme Court would not recognize a breach of fiduciary duty claim under the facts of this case. Numerous sources of authority support this determination. First, plaintiffs do not seek to predicate liability based on a transaction wherein Krawczyk failed to exercise scrupulous fairness and good faith in the dealings between the parties, such as a contractual relationship, a specific matter for which Krawczyk had been employed, the management of property, or the carrying out of duties for which Krawczyk had been engaged. To the contrary, plaintiffs seek to predicate liability based upon the repeated exposure to an unreasonable risk of harm created by conduct occurring in a social setting that was distinct from the formation of any landlord/tenant relationship or any specific engagement for religious counseling, teaching or advice.

■ Second, the intermediate appellate courts of Pennsylvania have recognized that the relationship between Krawczyk and Gaines as landlord and tenant does not in itself create a setting giving rise to a confidential or fiduciary relationship. A landlord/tenant relationship does not create any special duty of good faith or fiduciary duty. *Department of Transportation v. E–Z Parks, Inc.*, 153 Pa.Cmwlth. 258, 620 A.2d 712, 717 (1993). And a confidential or fiduciary relationship can arise in such a setting "only if one party surrenders substantial control over some portion of his affairs to the other." *Id.* (*quoting In re Estate of Scott*, 455 Pa. 429, 316 A.2d 883, 886 (1974)). While plaintiffs do allege that Gaines felt obligated to drink and socialize with Krawczyk due to the hospitality Krawczyk extended by permitting Gaines and Abdul to reside in the convent immediately following the fire, the recognition of a self-imposed obligation to socialize with members of the clergy out of gratitude falls far short of "surrendering substantial control over [a] portion of an individual's affairs."

Third, the federal and state supreme courts that have considered a breach of fiduciary duty claim in related settings uniformly have rejected attempts to found the cause of action merely on the relationship between parishioners and members of the clergy. Fiduciary duty claims generally have been advanced in two settings: where an adult parishioner seeks counsel-

ing from a priest or pastor after a traumatic or emotional event in the parishioner's life and sexual relations occur after the formation of the counseling relationship; and a minor child is entrusted to the care of a member of the clergy for religious teaching or training purposes and the minor child is sexually molested during the entrustment. While an examination of the case law in these areas reveals that the contours of a breach of fiduciary duty claim in these settings are evolving, it also provides persuasive support for the conclusion that the Supreme Court of Pennsylvania would not recognize a breach of fiduciary duty claim under the circumstances of this case.

In cases involving an adult parishioner, a split of authority has arisen among the states regarding whether a claim for breach of fiduciary duty may even be maintained without offending the Establishment Clause of the First Amendment. On the one hand, the jurisdictions to consider the matter have declined to expand the concept of a fiduciary relationship to settings involving advise received during a counseling relationship between adults due to the nature of the setting and the lack of consistent and uniformed standards and training among the various institutions. *See e.g. Franco v. The Church of Jesus Christ of Latter–day Saints,* 21 P.3d 198, 205 (Utah 2001) (declining to recognize claims for gross negligence, negligent infliction of emotional distress and breach of fiduciary duty based on advise and counseling received after parishioner reported sexual abuse by co-parishioner due to excessive government entanglement that would ensue by judicial definition of the duties and standards of care to be followed by reasonable clerics under the infinite array of circumstances that could arise) (collecting cases declining to recognize "clergy malpractice claims" in support). And a number of courts have extended this reasoning to cases involving the alleged

abuse of the clergy/parishioner relationship as a result of sexual conduct. *See Dausch v. Rykse,* 52 F.3d 1425, 1438 (7 th Cir.1994) (holding that Illinois would not recognize a breach of fiduciary duty claim based on inappropriate sexual relations in the context of a pastor/parishioner relationship under auspices of a counselor-counselee relationship because "[i]f the court were to recognize such a breach of fiduciary duty, it would be required to define a reasonable duty standard and to evaluate [the pastor's] conduct against that standard, an inquiry identical to that which Illinois has declined to undertake in the context of a clergy malpractice claim and one that is of doubtful validity under the Free Exercise Clause."); *Hawkins v. Trinity Baptist Church,* 30 S.W.3d 446, 453 (Tex.App.2000) (holding in case alleging improper sexual relationship growing out of marital counseling that "concerns toward treading upon the Free Exercise Clause" precluded recognition that the "pastor-member relationship in this case established a fiduciary duty.").

In contrast, other courts have analyzed the setting to that of a counseling relationship between a mental health professional and a vulnerable patient. These courts have reasoned that where the claim involves purely secular conduct that is analogous to an intentional tort and does not hinge on ecclesiastical matters, sexual misconduct claims arising in the context of pastoral counseling can be brought as a cause of action for breach of fiduciary duty. *See F.G. v. MacDonell,* 150 N.J. 550, 696 A.2d 697, 704 (1997) (holding that a sexual misconduct by pastor with adult parishioner is actionable as a breach of fiduciary relationship where vulnerable parishioner sought counseling from a trusted pastor who accepted the responsibility of providing counseling and noting in support that breach of fiduciary claims also have been recognized where a minor child had a

lengthy, detailed and "particularly close relationship with the Diocese" in which it exercised a superior position of [demonstrable] influence and authority" over the minor child's entrustment to the care of a pedofile priest); *Cf. Martinelli v. Bridgeport Roman Catholic Diocesan Corporation*, 196 F.3d 409, 430–32 (2d Cir.1999) (concluding that Connecticut would recognize breach of fiduciary relationship claim based on allegations of child molestation by priest where record contained numerous examples of specific ties between infant and priest and as well as Diocese's knowledge and repeated sponsorship of that relationship, notwithstanding Free Exercise Clause defense). The only Pennsylvania authority considering sexual misconduct claims in this setting has followed this line of cases and reasoning. *See Nardella v. Dattilo*, 36 Pa. D. & C.4th 364 1997 WL 1056878 (Pa.Com.Pl.1997) (*en banc*) (recognizing breach of fiduciary duty claim for sexual misconduct arising during counseling relationship between vulnerable adult parishioner and priest).

Throughout this evolving area of the law, however, it has consistently been recognized that the mere existence of a pastor-parishioner relationship does not in itself give rise to a fiduciary duty. *See Dausch*, 52 F.3d at 1438 (rejecting claim of injury during psycho-therapy grounded "in the context of a pastor-parishioner relationship"); *Hawkins*, 30 S.W.3d at 453 (noting the lack of "any Texas authority establishing that Texas recognizes a fiduciary relationship between a pastor and member"); *Richelle L. v. Roman Catholic Archbishop*, 106 Cal.App.4th 257, 130 Cal. Rptr.2d 601, 617 (2003) (noting weight of authority refusing to recognize confidential or fiduciary relationship based on mere pastor-parishioner relationship where claim is not grounded in marital, family or financial counseling); *F. G.*, 696 A.2d at 704 (distinguishing between claims based on breach of fiduciary duty arising out of a

counseling relationship and all other relationships between parishioners and members of the clergy); *Doe v. Hartz*, 52 F.Supp.2d 1027, 1064–65 (N.D.Iowa 1999) (declining to recognize fiduciary relationship based solely on priest/parishioner relationship and collecting substantial body of case law indicating breach of fiduciary duty claims against members of the clergy requires "something more than a priest-parishioner relationship."); *Martinelli*, 196 F.3d at 429 (acknowledging forceful argument that fiduciary relationship does not arise merely from relationship between Dioceses and its parishioners).

And within this context the courts consistently have recognized that claims seeking to establish a fiduciary duty based on a parishioner's "deeply religious" disposition and other forms of piety are insufficient as a matter of law. *Richelle L.*, 130 Cal. Rptr.2d at 617–18. (claim that parishioner was rendered vulnerable to reverend based on "deeply religious" disposition held insufficient as a matter of law due to the finder of fact's need to focus sharply on the nature and depth of the plaintiff's faith, and its basis, if any, in Roman Catholic doctrine); *Langford v. Roman Catholic Diocese of Brooklyn*, 177 Misc.2d 897, 677 N.Y.S.2d, 436 437–38, aff', 271 A.D.2d 494, 705 N.Y.S.2d 661 (2000) (same); *Strock v. Pressnell*, 38 Ohio St.3d 207, 527 N.E.2d 1235, 1237–39 (1988) (declining to recognize tortuous action based on consensual conduct between pastor and parishioner where conduct was not independently actionable in tort). The allegation of breach of fiduciary duty grounded in such circumstances is "simply an elliptical way to state a clergy malpractice claim," *Dausch*, 52 F.3d at 1428, which the courts have uniformly declined to recognize.

Plaintiffs do not allege that Gaines' death was the product of the abuse of a counseling relationship arising out of a

troubled parishioner seeking and obtaining consultation from a trusted member of the clergy. To the contrary, plaintiffs allege that Gaines's death and the injuries flowing therefrom arose from conduct by Krawczyk that is independently illegal and actionable: the serving of alcohol to an individual under the age of twenty-one which contributed to an accident causing that individual's death. The sole basis for the formation of a fiduciary relationship is Gaines' deep religious convictions and revered respect for members of the clergy in general. Under these circumstances we conclude the Supreme Court of Pennsylvania would decline to recognize a cause of action based upon a breach of a fiduciary relationship that would impose clerical duties in addition to the existing ones that already obligate defendants to refrain from violating the law and committing independently actionable tortuous conduct. Accordingly, plaintiff's claims for breach of fiduciary duty will be dismissed.

Defendants move to dismiss plaintiffs' fraudulent concealment claims, arguing the relationship between Gaines, plaintiffs and defendants did not give rise to a legal obligation to disclose information concerning prior allegations of misdeeds by Krawczyk or a duty to publicize such information. Plaintiffs rejoin by noting that the deliberate non-disclosure of a material fact will support an action for fraud and assert they have sufficiently pled the elements of a claim for fraudulent concealment. In addition, plaintiffs assert that a claim for fraudulent concealment is not limited to the context of a business transaction, and the court should take into account plaintiffs' asserted reliance on defendants' non-disclosure and the fact that defendants were the only reasonable source of information concerning past allegations made against Krawczyk and his conduct toward individuals under the age of twenty-one.

Plaintiffs' claims for fraudulent concealment are grounded in the following allegations. Prior allegations of furnishing alcohol to minors and engaging in inappropriate sexual conduct were leveled against Krawczyk and the existence of these allegations and any information pertaining to them were uniquely within the defendants' knowledge. Defendants concealed these allegations and Krawczyk's conduct from the general public, including the community of Homestead where the St. Anne Catholic Church is located. Gaines reasonably relied on the absence of such accusations and admissions in agreeing to live on the grounds of St. Anne Catholic Church, and plaintiffs did the same in permitting Gaines to live there. Gaines' decision to live on the grounds led to his intoxication and the accident causing his death.

The Supreme Court of Pennsylvania has identified the following elements to a common law cause of action for intentional misrepresentation or fraud: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) a resulting injury proximately caused by the reliance. *Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 889 (1994). A cause of action for intentional non-disclosure has the same elements except an intentional concealment calculated to deceive must be shown instead of an affirmative misrepresentation. *Id.* at 889 n. 12; *Duquesne Light Co. v. Westinghouse Electric Corp.*, 66 F.3d 604, 612 n. 6 (3d Cir.1995).

Although the above elements set forth the general contours of a cause of action in fraud, "[i]t is axiomatic, of course, that silence cannot amount to fraud in the

absence of a duty to speak." *Sunquest Information Systems, Inc. v. Dean Witter Reynolds, Inc.*, 40 F.Supp.2d 644, 656 (W.D.Pa.1999); *Duquesne Light Co.*, 66 F.3d at 611–12; *In re Estate of Evasew*, 584 A.2d at 913. Pennsylvania's fraudulent concealment law is grounded in Section 551 of the Restatement (Second) of Torts, which defines the limited circumstances under which the duty to speak arises between parties to a particular transaction. *Duquesne Light Co.*, 66 F.3d at 611–12; *Jeter v. Brown & Williamson Tobacco Corp.*, 294 F.Supp.2d 681, 688 (W.D.Pa.2003).

Pennsylvania courts determine whether there is a duty to speak based almost exclusively on the nature of the transaction between the parties and the scope of one party's reliance on the representations of the other. *Duquesne Co.*, 66 F.3d at 612. The duty has been extended to situations involving latent defects in the sales of real estate, such as a termite infestation where the buyer is at the whim of the seller to disclose the matter because it is not discoverable by other reasonable means. *Id.* Beyond this arena the duty does not ordinarily arise in a transaction unless there is a confidential or fiduciary relationship between the parties. *Sunquest Information Systems*, 40 F.Supp.2d at 656 (*citing Drapeau v. Joy Tech., Inc.*, 447 Pa.Super. 560, 670 A.2d 165, 171 (1996) (Beck, J., concurring) (*citing Federal Land Bank v. Fetner*, 269 Pa.Super. 455, 410 A.2d 344 (1979) and *City of Harrisburg v. Bradford Trust Co.*, 621 F.Supp. 463 (M.D.Pa.1985)). Such a relationship does not arise in a typical transactional setting unless "one party surrenders substantial control over some portion of its affairs to the other." *Sunquest Information Systems*, 40 F.Supp.2d at 656 (*quoting Drapeau*, 670 A.2d at 172)). Similarly, the duty does not arise where the parties have or can be assumed to have equal knowledge to the information available. *Duquesne Light Co.*, 66 F.3d at 612;

*Sunquest Information Systems*, 40 F.Supp.2d at 657 (collecting cases reflecting presumed or actual access to omitted information).

 Furthermore, a misrepresentation by concealment will be recognized only where the information is material to the transaction at hand. *Sevin v. Kelshaw*, 417 Pa.Super. 1, 611 A.2d 1232, 1237 (1992). "A misrepresentation is material if it is of such character that … had it been made, the transaction would not have been consummated." *Id.* (*citing Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243, 1252 (1983)). In addition, the plaintiff must be able to prove a causal connection between the alleged concealment and claimed harm in order to prevail on a claim of fraud. *Petrucelli v. Bohringer and Ratzinger*, 46 F.3d 1298, 1309 (3d Cir.1995). "Thus, a plaintiff who cannot establish some direct relation between the injury asserted and the injurious conduct alleged fails to plead a key element for establishing proximate causation, independent of and in addition to other traditional elements of proximate cause." *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 423 (3d Cir. 2002). An injury that is too remote from its causal agent fails to satisfy tort law's proximate cause requirement and claims premised on such remote causal connections are subject to dismissal. *Id.*

 Plaintiffs' attempt to predicate a claim of fraud on the landlord/tenant relationship between Gaines and Krawczyk is specious. Although Krawczyk's propensity to serve alcohol to minors and the allegations that he served alcohol to Gaines in a manner that contributed to his death identify conduct that is independently unlawful and may lead to liability pursuant to numerous causes of action, including the negligence, negligent employment and negligent entrustment actions set forth in

Counts I through VI of plaintiffs' First Amended Complaint, knowledge of this alleged propensity cannot be found to have been intentionally withheld from Gaines at the time he accepted the invitation to move into the convent. Plaintiffs acknowledge that Krawczyk served alcohol to Gaines on several occasions in the spring and summer of 2002, a year before Gaines moved to the convent. First Amended Complaint at ¶¶ 21–23. Plaintiffs further acknowledge that Gaines and Krawczyk drank together during that time and Krawczyk drove Gaines home on at least one occasion while under the influence of alcohol *Id.* Thus, at the time Gaines entered into the landlord/tenant transaction he was well aware of this aspect of Krawczyk's behavior. It is axiomatic that one does not have a duty to disclose that which is already known to the other party entering into a transaction. Consequently, this aspect of Krawczyk's past behavior cannot serve as a material omission in the formation of the lease between Gaines and Krawczyk/St. Anne Catholic Church.[2]

■■■■ Moreover, plaintiff's allegation that in the 1980's Krawczyk was accused of furnishing illegal controlled substances to and making a sexual advancement on a minor boy are too remote to be the cause of plaintiff's harm for the purposes of establishing a fraudulent concealment claim. Plaintiffs do not allege that this or any similar type of conduct occurred between Krawczyk and Gaines, let alone that such conduct was a cause in bringing about Gaines' death. Because it is not alleged that Gaines was exposed to such conduct, any attempt to base fraud liability on these twenty year old allegations fails as a matter of law.

■■■ Plaintiffs' claim of fraud based on the concealment of Krawczyk's past misdeeds from the general public and the community of Homestead equally is without adequate legal foundation. Pennsylvania's law governing fraudulent concealment is grounded in Section 550 of the Restatement (Second) of Torts. *Sevin,* 611 A.2d at 1236. That section provides:

> One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the non-existence of the matter that the other was thus prevented from discovering.

Restatement (Second) of Torts § 550 (1977). A cause of action for fraudulent concealment based on Pennsylvania's common law and/or this section of the Restatement is limited to contracts and other forms of transactional relationships between specific parties. *See Gibbs,* 647 A.2d at 889 (to recover on a claim of fraud, a plaintiff must prove, by clear and convincing evidence, among other things, that a misrepresentation or omission which was material to the transaction at hand was falsely made or intentionally withheld); *Duquesne Light Co.,* 66 F.3d at 611 (noting the general restrictions of fraudulent concealment liability to business transactions). And even in such settings a duty to speak does not normally arise between the parties in the absence of a confidential or fiduciary relationship. *Daniel Boone Area School District v. Lehman Brothers, Inc.,* 187 F.Supp.2d 400, 408 (W.D.Pa.2002).

The courts of Pennsylvania have recognized fraudulent concealment claims in the

---

**2.** Plaintiffs were not a legal party to the lease. Furthermore, Gaines was an adult for the purposes of this transaction and defendants do not share legal responsibility for decisions Gaines made about whether Krawczyk's known conduct should have been brought to plaintiffs' attention during any discussions that occurred between Gaines and plaintiffs concerning Gaines' living arrangements in May of 2003.

sale of real estate, business transactions involving the transfer of chattel and in testamentary or transfer of wealth transactions. *See Duquesne Co.,* 66 F.3d at 611–12 (business transaction); *Quashnock v. Frost,* 299 Pa.Super. 9, 445 A.2d 121, 125 (1982) (real estate transaction); *In the Matter of Estate of Evasew,* 584 A.2d at 910 (recognizing breach of confidential relationship and constructive fraud in transfer of property affecting a decedent's testamentary disposition). A limited form of liability on this ground also has been recognized in a manufacturer's failure to disclose a dangerous defect to known users of a product. *See Binder v. Jones & Laughlin Steel Corp.,* 360 Pa.Super. 390, 520 A.2d 863, 864 (1987) (imposing liability on supplier of chattel for failing to inform users of dangerous conditions). In none of these cases, however, has any court applying Pennsylvania law stated or implied that the duty to speak for the purposes of fraudulent concealment extends to the residents of a community or the general public at large.

 Plaintiffs have failed to advance any authority supporting the extension of the duty to speak in the manner necessary to sustain a fraudulent concealment claim based on the asserted non-disclosure of Krawczyk's past misdeeds to the general public or the residents of Homestead, Pennsylvania. Thorough research by the court has failed to reveal any basis for such an extension. To the contrary, the Supreme Court of Pennsylvania has taken a cautionary approach to the expansion of tort liability for intentional non-disclosure.

*See Gibbs,* 647 A.2d at 889 n. 12. In light of these circumstances, the assessment of Judge Bennett of the Northern District of Iowa rendered in considering a similar claim of fraud is particularly apropos:

> The court is unwilling to construe an on-going relationship between a priest and members of his congregation as a 'transaction' giving rise to a general and all-encompassing duty to disclose any past misconduct unknown to the congregation to everyone at the commencement of or during the course of the relationship.
>
> Although parishioners might want to know that a priest assigned to their church has a history of [past] misconduct—just as people in a neighborhood might want to know that their next door neighbor is a convicted child molester— the court can find no duty under [the applicable] law for a priest to wear a 'Scarlet Letter' disclosing his past misconduct, or any duty upon his superiors to make a disclosure of his past misconduct. Lack of such a legal duty to disclose—the first element of [the plaintiff's] fraudulent concealment claim ... is an 'insuperable bar' to [the plaintiff's] fraudulent concealment claim, requiring its dismissal.

*Doe,* 52 F.Supp.2d at 1057–1058. It follows that plaintiffs' fraudulent concealment claims must be dismissed.[3]

 Plaintiffs' requests for the recovery of "hedonic damages," which are also known as an award for the loss of life's enjoyment and pleasures, also must

---

**3.** The dismissal of plaintiffs' claims for breach of fiduciary duty and fraudulent concealment also compel the dismissal of their claim for civil conspiracy. It is well-settled that a civil conspiracy may not be maintained without an underlying tort. *See In re Orthopedic Bone Screw Products Liability Litigation,* 193 F.3d 781, 789 & n. 7 (3d Cir.1999) (collecting cases). Pennsylvania law follows this well-

established rule. *Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 405–06 (3d Cir.2000) (surveying Pennsylvania appellate authority in holding that a verdict on a civil conspiracy claim must yield to a finding for the defendant on the underlying tort because "the cause of action is wholly subordinate to the underlying tort's existence.").

be stricken from the complaint. The United States Court of Appeals for the Third Circuit long ago recognized that in wrongful death and survival actions brought under Pennsylvania law "the measure of damages is the pecuniary loss sustained by the next of kin on whose behalf the action is brought." *Curnow v. West View Park Company,* 337 F.2d 241, 242 (3d Cir.1964) (*citing Piacquadio v. Beaver Valley Service Co.,* 355 Pa. 183, 49 A.2d 406, 407 (1946)). And the Supreme Court of Pennsylvania has conclusively held that an award for loss of life's amenities, including the loss of life's pleasures and enjoyment, "is simply not one of the elements of recovery in wrongful death and survival actions." *Willinger v. Mercy Catholic Medical Center,* 482 Pa. 441, 393 A.2d 1188, 1191 (1978).[4]

Similarly, plaintiffs have failed to identify any basis for the recovery of attorneys fees and costs. Accordingly, the requests for the same likewise will be stricken.

In light of the above, defendants' motions to dismiss will be granted to the extent they seek the dismissal of plaintiffs' causes of action for breach of fiduciary duty, fraud and civil conspiracy and to the extent the remaining causes of action seek to recover "hedonic damages" and attorneys fees and costs. The motions will be denied in all other aspects. An appropriate order will follow.

### ORDER OF COURT

On this 18th day of November, 2004, for the reasons set forth in the Opinion filed this day, IT IS ORDERED that defen-

4. A "survival action" does vest in the decedent's personal representative the right to recover for the decedent's pain and suffering between injury and death as well as the loss of gross earning power from the date of injury until death, less probable costs of maintenance and any amount awarded for wrongful death. *Frey v. Pennsylvania Electric Co.,* 414 Pa.Super. 535, 607 A.2d 796 (1992). Of

dants' motions to dismiss (Doc. Nos. 17 & 28) be, and the same hereby are, granted in part and denied in part. Counts VII through XII are dismissed. Plaintiffs' request for "hedonic damages" and attorney's fees and costs in all remaining counts are stricken from the First Amended Complaint. The motions are denied in all other aspects.

course, the court will properly instruct the jury on the measure of damages permitted under both the Wrongful Death and Survival Acts. And the court's ruling with regard to the loss of life's pleasures or amenities is not intended to restrict any of the customary measures of recovery in such actions. *See* Pennsylvania Suggested Standard Civil Jury Instructions (Civ.) at 6.10.