Filed 3/21/25

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| DAVID SUCHARD et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>SONOMA ACADEMY,<br><br>    Defendant and Respondent. | A169841<br><br>(Sonoma County<br>Super. Ct. No. SCV-270984) |

Plaintiffs are two parents and a student who paid tuition to defendant Sonoma Academy (the school or defendant). They allege the school employed three people who engaged in sexually abusive or inappropriate behavior with *other* students—neither the plaintiffs nor their children—and defendant did not disclose that conduct to them. Defendant's omissions, according to plaintiffs, amounted to unfair business practices under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.; UCL),[1] constructive fraud (Civ. Code, § 1573), and fraud by concealment. The named plaintiffs seek to pursue this action on behalf of a class of those who paid tuition to the school.

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III and IV of the Discussion.

[1] All undesignated statutory references are to the Business and Professions Code.

The trial court sustained defendant's demurrer to the second amended complaint without leave to amend and dismissed the action. Plaintiffs appeal, and we affirm. In the published portion of the opinion, we conclude named plaintiffs lacked standing to assert the UCL claim because their students received the education for which plaintiffs paid, unaffected by the alleged misconduct directed at others. The unpublished portion of the opinion rejects plaintiffs' remaining arguments.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Allegations of the Complaint

Plaintiffs filed their original complaint in June 2022, alleging the three causes of action listed above as well as a claim for false advertising. (§ 17500 et seq.) After the trial court sustained defendants' demurrer in part with leave to amend, plaintiffs filed a first amended complaint. Defendants again demurred, and the trial court sustained the demurrer as to each cause of action with leave to amend. Plaintiffs then filed the operative second amended complaint (the complaint).

The complaint alleges defendant is a private high school with approximately 300 students, and it charges more than other similar schools— by the 2020–2021 school year, nearly $50,000 for tuition and dining. Two of the named plaintiffs, David Suchard and Jody Suchard, paid tuition for their child to attend the school from approximately 2015 to 2017. The remaining named plaintiff, Jane Doe, paid the school for her own tuition from 2018 to 2021.

Beginning in 2002, the school employed three people who it knew sexually abused, assaulted, and harassed students, but it failed to inform class members or the public of their behavior or of the school's own failure to make required reports. First, in 2002, a soccer coach formed a close

2

relationship with a female student, used her position as coach to "groom" the student, and subsequently sexually abused the student multiple times. The school terminated the coach's employment but did not report the event to law enforcement or child welfare authorities, nor to students, potential students, and their families at the school. Second, in 2004 the school hired a teacher who used his position to abuse two female students sexually. An administrator received word from school counselors that there might be a problem with this teacher, but again no problem was ever reported to authorities or disclosed to the school community.

A third employee, Marco Morrone, who taught at the school from 2002 until 2020, is the subject of the most extensive allegations. According to the complaint, Morrone assaulted, sexually abused, or harassed numerous young students, for example by selecting favorite female students for extra attention and praise, making sexually charged comments to them, seeking opportunities for private, personal conversations with them, hiring them as babysitters, and driving them alone; by encouraging students to write about sexual topics in class exercises; by assigning readings of sexually explicit texts; by touching students in an inappropriately intimate manner; by abruptly withdrawing attention from favorite students; and by physically assaulting male students under the guise of teaching martial arts classes.

The complaint alleges that people began to notice and comment on the closeness of Morrone's relationships with female students, and to bring their concerns to administrators at the school, by approximately 2004; a parent complained in 2006 that Morrone had assigned the book "Lolita"; rumors of Morrone's inappropriate closeness to female students (including a rumored sexual relationship with a student in 2013) persisted; students and alumni made complaints about Morrone's sexually inappropriate behavior in 2007

3

and 2012; and a parent complained in 2018 that Morrone had used a " 'free writing' " exercise to develop a confiding relationship with her son, then abruptly withdrew his attention. In 2007, during a training session with a human resources consultant that school administrators required Morrone to attend, he admitted he had engaged in inappropriate behavior with students. The consultant recommended that the school monitor Morrone, but the school did not do so.

As these events unfolded, defendant did not inform students, potential students, or their parents about them, and it did not file a mandated report under the Child Abuse and Neglect Reporting Act. (Pen. Code, § 11164 et seq.; CANRA.) All the while, the school promoted itself as a "safe, prestigious, and high-quality educational institution" that provided a "close-knit community," and it continued to charge premium tuition. Had plaintiffs and the class members known of the employees' behavior, they allege, they would not have paid the tuition the school charged.

The law firm of Debevoise & Plimpton LLP prepared a report for the school's board of trustees, which was released publicly in November 2021 (the Debevoise report). The report found the school's administrators, including its former head of school and assistant head of school, were informed of numerous acts of sexual misconduct by faculty and staff from 2004 to 2020.

In the second amended complaint, the named plaintiffs seek to bring this action on behalf of themselves and a class of "[a]ll parents, family members, guardians or students" who paid tuition to the school from "2003 to 2020 for students who graduated before July 2020," a class that plaintiffs allege includes "parents, guardians, loved ones, students and other

4

individuals" who paid tuition for students.[2]  They allege that due to defendants' failure to disclose the sexual abuse and inappropriate conduct and to report it, they were induced to believe the school provided a safe environment and to enroll themselves or their children at the school.  And, they allege, as a result they paid more than they would have done had they known of the misconduct.

On these facts, the complaint alleges causes of action for unfair business practices (§ 17200 et seq.), constructive fraud (Civ. Code, § 1573), and fraud by concealment.  Among the remedies plaintiffs seek are class certification, injunctive relief, damages, and restitution of tuition.  On restitution, the complaint alleges "[n]o parent would knowingly place their child in such an environment," so "the full amount of tuition paid by class members during the concealment period qualifies as Defendant's ill-gotten gains."  But this amount must be offset by any value the class members received, the complaint acknowledges, proposing to calculate such value "by comparison to similarly situated high schools" that do not charge the premium tuition defendant does.

## II.    Ruling on Demurrer

Defendants demurred to the second amended complaint, and the trial sustained the demurrer without leave to amend.  First, as to the cause of action for unfair business practices, the court reasoned that the class as defined did not show a common deficiency in the education the school provided because it included those whose children were not taught by abusive faculty and were unaware of the accusations of misconduct.  In addition, the

---

[2] The relevant dates in the original complaint, filed in June 2022, and the first amended complaint, filed in March 2023, were different, defining the class as all persons who paid tuition from 2006 to "the present."

court pointed out, the definition of the class in the most recently amended complaint actually excluded one of the named plaintiffs, who paid for tuition after the 2020 cutoff date. As to the cause of action for constructive fraud, the court concluded the complaint did not adequately allege that the school had a confidential relationship with, or a fiduciary duty to, all class members. As to fraud by concealment, the court concluded the complaint did not plead facts sufficient to support a duty to disclose to the members of the class, that CANRA required reports not to plaintiffs but to law enforcement or other governmental agencies, and that common issues did not predominate. The court therefore dismissed the action.

## DISCUSSION

### I.    Standard of Review

We review the trial court's order sustaining the demurrer de novo, "exercising our independent judgment to determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] We accept the truth of material facts properly pleaded in the operative complaint, but not contentions, deductions, or conclusions of fact or law." (*Martis Camp Community Assn. v. County of Placer* (2020) 53 Cal.App.5th 569, 609–610 (*Martis Camp*).) We review the correctness of the trial court's action, not its stated reasons for its decision. (*Id.* at p. 610.)

Denial of leave to amend is reviewed for abuse of discretion. (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 459.) Our inquiry is whether there is a reasonable possibility plaintiffs could cure the defect. (*Martis Camp, supra,* 53 Cal.App.5th at p. 610.) "[W]here the nature of the plaintiff's claim is clear, and no liability exists, a court should deny leave to amend because no amendment could change the result." (*Ibid.*) Plaintiffs have the burden to

6

prove a reasonable possibility that an amendment would cure the defect and to show the trial court abused its discretion in denying leave to amend. (*Tucker v. Pacific Bell Mobile Services* (2012) 208 Cal.App.4th 201, 211 (*Tucker*); *Martis Camp*, at p. 610.)

## II. UCL Claim

In their first cause of action, for violation of the UCL, plaintiffs allege defendant engaged in unfair competition by its failure to disclose the misconduct and failure to comply with its reporting obligations under CANRA and that, as a result, plaintiffs and the putative class members suffered injury by spending money for tuition at the rates the school charged.

UCL prohibits "unfair competition," defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [section 17500 et seq., the false advertising law]." (§ 17200; see *Hansen v. Newegg.com Americas, Inc.* (2018) 25 Cal.App.5th 714, 722.) The purpose of the law is to "protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949.) To that end, the scope of the law is broad, permitting independent liability for unfair competition to be based on violations of other laws or on practices that, though not specifically proscribed by another law, are unfair or deceptive. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.)

To have standing to bring an action under the UCL, a person must have "suffered injury in fact and [have] lost money or property as a result of the unfair competition." (§ 17204; see *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322 (*Kwikset*).) Such injury is " 'an invasion of a legally protected interest which is (a) concrete and particularized, [citations]; and

7

(b) "actual or imminent, not 'conjectural' or 'hypothetical.' " ' " (*Kwikset*, at p. 322.)  The injury must " 'affect the plaintiff in a personal and individual way' " (*id*. at p. 323), and it must be economic (*ibid*., citing *Animal Legal Defense Fund v. Mendes* (2008) 160 Cal.App.4th 136, 147 (*Animal Legal*)). Economic injury may be shown in "innumerable ways," including spending more in a transaction, or acquiring less, than the plaintiff otherwise would have done.  (*Kwikset*, at p. 323.)  In a class action under the UCL, the standing requirement applies to the class representatives rather than to unnamed class members.  (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 306, 314–324.)

The UCL also requires that the injury be the *result* of the unfair competition.  (§ 17204; *Kwikset*, *supra*, 51 Cal.4th at p. 326.)  The plaintiff must have lost money because of the defendant's actions.  (*Kwikset*, at p. 326.)  Where the claim is based on a theory of fraud, the misrepresentation must be " 'an immediate cause of the injury-producing conduct.' " (*Id*. at pp. 326–327.)

*Kwikset* illustrates these principles.  The plaintiffs there brought a representative action seeking injunctive relief against a defendant who allegedly marketed and sold locksets that were falsely labeled " 'Made in U.S.A.,' " when they contained foreign parts or involved foreign manufacture. (*Kwikset*, *supra*, 51 Cal.4th at pp. 317, 319.)  The plaintiffs alleged they saw or read the false statements and were induced to buy the locksets by the representation that the products were made in the United States.  (*Id*. at p. 319.)  The trial court overruled the defendant's demurrer, and the appellate court granted writ relief on the ground that the plaintiffs had not alleged the locksets they received were overpriced or defective and hence had

not alleged injury. (*Id*. at pp. 317, 319.) On review, our high court concluded this ruling was erroneous.

The court began its analysis with the observation, "labels matter." (*Kwikset*, *supra*, 51 Cal.4th at p. 328.) It noted that a product's place of origin was important to some consumers, and that this was why Kwikset advertised its products as " 'Made in U.S.A.' " (*Id*. at pp. 328–329.) A consumer who bought a lockset in reliance on Kwikset's allegedly false representation of origin suffered economic harm by paying more for the product than he or she otherwise would have been willing to pay, had it been labeled accurately. (*Id*. at p. 329.) That the product Kwikset actually sold was functionally equivalent to a product made in the United States was irrelevant, just as it would be irrelevant that a counterfeit Rolex watch might tell time as accurately as the genuine article. (*Ibid*.) Thus, our high court concluded, "[a] consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of section 17204 by alleging . . . that he or she would not have bought the product but for the misrepresentation." (*Id*. at p. 330.)

Looking beyond labels, the court in *Kwikset* set forth other examples of injury that supported standing under the UCL: where the plaintiffs alleged they paid more than they otherwise would have because of a price-fixing cartel (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 788–789); where a plaintiff alleged an unfair business practice resulted in repossession of her vehicle and payment for an unlawful debt collection demand (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1090); and where a plaintiff alleged the defendants' business practices required him to buy more fuel than he otherwise would have done (*Aron v. U-Haul Co. of California* (2006) 143 Cal.App.4th 796, 802–803). (*Kwikset*, *supra*, 51 Cal.4th at p. 325.) In these

9

cases, the pattern is clear; the plaintiffs all allege they paid more or received less as a result of the challenged conduct.

Here, plaintiffs argue their case is similar to *Kwikset* in that they would not have enrolled their students in the school or paid the school's expensive tuition, had defendant not deceived them by failing to disclose the misconduct of two teachers and a coach and the failure of the school to report it. They contend these allegations concern economic harm suffered at the time they paid tuition.

We are unpersuaded that the complaint adequately alleges these plaintiffs suffered an injury in fact. For purposes of the UCL, such injury must be " 'concrete and particularized,' " and " ' "actual or imminent, not 'conjectural' or 'hypothetical.' " ' " (*Kwikset*, *supra*, 51 Cal.4th at p. 322; see *Birdsong v. Apple, Inc.* (9th Cir. 2009) 590 F.3d 955, 961 (*Birdsong*) [loss of value due to hypothetical risk of hearing loss from unsafe use of iPod is not "distinct and palpable injury that is actual or imminent" under UCL].) Whether or not the families of students who were sexually harassed or abused suffered such an injury—a question we are not called upon to decide—there is no allegation that the named plaintiffs or the students for whom they paid tuition suffered sexual abuse or harassment, were aware of such behavior, or experienced any detriment from the misconduct that allegedly occurred. In fact, in an effort to avoid the bar of the statute of limitations, the complaint alleges the named plaintiffs and putative class members first learned of the sexual abuse only after the Debevoise report was released in November 2021, years after the last alleged act of sexual misconduct. (See *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 [under "discovery rule," accrual of cause of action is postponed until plaintiff discovers, or has reason to discover, cause of action].)

Thus, unlike the case in *Kwikset*—in which each plaintiff purchased a lockset that was not what the defendant represented it to be (*Kwikset*, *supra*, 51 Cal.4th at pp. 329–330)—there is no allegation that the value of the education for which plaintiffs paid was reduced by the alleged improprieties of three of the school's employees toward other students. At most, the complaint's allegations show that the students were at *risk* of abuse due to the undisclosed presence of abusive faculty and staff, a risk that never materialized for the students whose tuition the named plaintiffs paid. *These* students got the education for which they and their parents had paid. Any injury to them remains at most conjectural and hypothetical. (See *Birdsong*, *supra*, 590 F.3d at p. 960 [purchasers of iPods lack UCL standing where "risk of injury the plaintiffs allege is not concrete and particularized *as to themselves*"].)

Plaintiffs insist they suffered an economic injury in that they were deceived into overpaying for tuition by defendant's failures to disclose. They analogize their case not only to *Kwikset*, but also to cases in which defendants were alleged to have violated the UCL by failing to disclose material facts regarding the products they sold. In *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1381, the defendant sold motor fuel in "non-temperature-adjusted 'gallon' units without disclosing the effects of thermal expansion," thus deceiving customers into believing they were buying standard gallons of fuel. The appellate court concluded the plaintiffs had alleged economic injury for purposes of standing under the UCL because they were required to purchase more fuel and pay more in taxes than if the fuel had been sold in temperature-adjusted gallons, and they were deceived as to the fuel's true price. (*Id.* at p. 1375.) The plaintiff in *Medrazo v. Honda of North Hollywood* (2012) 205 Cal.App.4th 1, 12–13, showed economic injury where the

11

defendant did not disclose additional charges for a motorcycle until the plaintiff had made the decision to purchase it.[3] And in *Donohue v. Apple, Inc.* (N.D.Cal. 2012) 871 F.Supp.2d 913, 920–921 (*Donohue*), the plaintiff alleged economic injury where the defendant failed to disclose that its product, an iPhone, had an allegedly defective "signal meter" that misled users as to the strength of their cellular connection. (Accord *Collins v. eMachines, Inc.* (2011) 202 Cal.App.4th 249, 253, 258 (*Collins*) [defendant's computers could not properly read floppy disks, an essential task].) Thus, in each of these cases, the plaintiffs did not receive the goods they expected at the price they expected—and in that, they suffered a concrete, economic injury—because of the defendants' omissions. The same cannot be said here, where plaintiffs do not allege that the education they or their children received was altered in any way by the school's alleged failure to disclose its employees' improper behavior.

We think this case is more like *Animal Legal*, *supra*, 160 Cal.App.4th 136. There, plaintiff consumers of retail dairy products brought a UCL claim against calf ranchers, alleging the ranchers confined their animals in spaces so small as to violate the Penal Code. (*Animal Legal*, at pp. 139–140, discussing Pen. Code, § 597t.) Challenged as to their standing to assert this claim, the plaintiffs contended they suffered economic injury in "that they bought milk they otherwise would not have bought if they had thought some of the producing herd may have been raised by respondents in cruel conditions." (*Animal Legal*, at p. 146.) The plaintiffs " 'reasonably presumed that the products [they purchased] were being produced in accordance with

_____

[3] The same division that decided *Medrazo* later disapproved it to the extent it concluded that there was no need to show reliance in a UCL action premised on a fraud theory. (*Veera v. Banana Republic, LLC* (2016) 6 Cal.App.5th 907, 919.)

12

California law,' " and on discovering otherwise they alleged they had been "deprived of the 'benefit of the bargain.' " (*Ibid*.)

The *Animal Legal* court rejected this analysis. It reasoned that because the consumers had never expressed to anyone their assumptions regarding the treatment of the dairies' cows, "those assumptions could not have been part of the 'bargain.' " (*Animal Legal, supra,* 160 Cal.App.4th at pp. 146–147.) The court concluded the consumers had, in fact, received the benefit of their bargain because the milk they purchased was not of inferior quality, and while they may have suffered a " 'moral injury,' " they had not suffered an economic one and were without standing to assert the UCL claim. (*Id*. at p. 147.)

Similarly in this case, plaintiffs may have presumed the school was providing a learning environment free of sexual harassment and abuse or reporting and disclosing incidents that fell short of this standard. But the named plaintiffs do not allege they discussed with defendant, when they were transacting over tuition, their assumption that the school would disclose such incidents, so we fail to see how they did not receive the benefit of their bargain.

Plaintiffs correctly point out that *Animal Legal* predates *Kwikset*, but *Kwikset* does not repudiate the earlier case's "benefit of the bargain" rationale. *Kwikset* had no occasion to, as there the consumers *had* "bargained for locksets that were made in the United States"; yet still, "they got ones that were not." (*Kwikset, supra,* 51 Cal.4th at p. 332.) "*Whether or not* a party who actually received the benefit of his or her bargain may lack standing, in this case, under the allegations of the complaint, plaintiffs did not" receive that benefit, the *Kwikset* court explained. (*Ibid*., italics added.) And elsewhere, *Kwikset* cited approvingly to *Animal Legal*'s understanding

13

that the injury required for UCL standing " 'must be economic, at least in part.' " (*Kwikset*, at p. 323.) *Kwikset*, in short, does not undermine *Animal Legal*, and does not provide plaintiffs a basis for asserting standing here. Moreover, plaintiffs' authority has, since *Kwikset*, endorsed the continuing viability of a "benefit of the bargain" rationale. The *Donohue* court explained, in upholding standing for a plaintiff alleging a defect in his iPhone, "Apple's admitted 'mistake' caused economic injury by depriving plaintiff of the 'benefit of the bargain' for which he paid." (*Donohue*, *supra*, 871 F.Supp.2d at p. 920; see also *Lagrisola v. North American Financial Corp.* (2023) 96 Cal.App.5th 1178, 1194–1195 ["*Kwikset* court did not reject ['benefit of the bargain'] analysis"].)

The converse is true here. The complaint does not allege the school inflicted any economic injury on named plaintiffs because there is no allegation it provided their students with anything but the education for which plaintiffs had bargained. The trial court thus properly sustained the demurrer to this cause of action.

## III. Causes of Action for Fraud

In their two remaining fraud-based causes of action, plaintiffs allege on behalf of themselves and a putative class that the school breached its duty to disclose to them material facts: that there were reports of sexual abuse, harassment, and assault, that the school employed three sexual predators who were not fit to interact with minors, and that the school had failed to report instances of sexual improprieties. And, plaintiffs allege, defendant had a duty to disclose the information under CANRA.

### *Requirements for Class Actions*

In considering the trial court's order sustaining the demurrer as to these causes of action, we bear in mind that, although the decision whether

14

an action is suitable for class treatment is ordinarily made on a motion for class certification, it may be made on demurrer if the court " 'concludes as a matter of law that, assuming the truth of the factual allegations in the complaint, there is no reasonable possibility that the requirements for class certification will be satisfied.' " (*Tucker, supra*, 208 Cal.App.4th at p. 211.) The question is whether there is a " ' " ' "reasonable possibility" plaintiffs can plead a prima facie community of interest among class members.' " ' " (*Id.* at pp. 211, 215.)

A class action is appropriate "if there is an ascertainable and sufficiently numerous class [and] a well-defined community of interest among the class members, and substantial benefits from certification render proceeding as a class superior to other alternatives." (*Maarten v. Cohanzad* (2023) 95 Cal.App.5th 596, 609.) The named plaintiffs must show that "common issues of fact or law predominate and that the representative's claim is typical of the class." (*Kizer v. Tristar Risk Management* (2017) 13 Cal.App.5th 830, 849.) The question is whether the issues framed by the pleadings and the law are " ' " " 'susceptible of common proof' " ' " for all class members, or "whether the class members will ' "be required to litigate numerous and substantial questions determining [their] individual right to recover following [a] 'class judgment' on common issues." ' " (*Downey v. Public Storage, Inc.* (2020) 44 Cal.App.5th 1103, 1113 (*Downey*).) If the individual class members' ability to recover clearly depends on separate sets of facts, the action may appropriately be dismissed at the pleading stage. (*Newell v. State Farm General Ins. Co.* (2004) 118 Cal.App.4th 1094, 1101–1102 (*Newell*).) The focus is on the facts and elements needed to establish liability, rather than on the amount of the class members' damages. (*Downey*, at p. 1113.)

15

***Standards for Constructive Fraud and Fraud by Concealment***

Plaintiffs' second cause of action is for constructive fraud. This is " 'a unique species of fraud applicable only to a fiduciary or confidential relationship,' " and involves " 'a breach of legal or equitable duty, trust or confidence which results in damage to another even though the conduct is not otherwise fraudulent.' " (*Salahutdin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 562, italics omitted; see Civ. Code, § 1573.) Plaintiffs have not attempted to plead a legally defined fiduciary relationship with the school, but they do allege they had a confidential relationship giving rise to similar duties.

The third cause of action is for fraud by concealment. This cause of action arises when the defendant conceals a material fact; the defendant had a duty to disclose the fact to the plaintiff; the defendant intentionally concealed it with the intent to defraud the plaintiff; the plaintiff was unaware of the fact and would have acted otherwise if aware; and as a result, the plaintiff sustained damage. (*SCC Acquisitions, Inc. v. Central Pacific Bank* (2012) 207 Cal.App.4th 859, 864 (*SCC*).) A duty to disclose may arise when there is a confidential relationship between the plaintiff and the defendant; when the defendant makes a representation that is likely to mislead for want of disclosure; when the defendant actively conceals the undisclosed matter; or when one party to the transaction has sole knowledge and access to material facts and knows they are not known to or reasonably discoverable by the other party. (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 346–347; accord, *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 311 (*Bigler-Engler*), *Collins*, *supra*, 202 Cal.App.4th at p. 255.)

For these purposes, the elements of a confidential relationship are: " '1) The vulnerability of one party to the other which 2) results in the empowerment of the stronger party by the weaker which 3) empowerment has been solicited or accepted by the stronger party and 4) prevents the weaker party from effectively protecting itself.' " (*Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 272 (*Richelle L.*).) This vulnerability is "the necessary predicate of a confidential relation," and is " 'absolutely essential.' " (*Id.* at p. 273.) It "usually arises from advanced age, youth, lack of education, weakness of mind, grief, sickness, or some other incapacity," as in the case of an elderly person in a weakened mental and physical condition induced by a friend to make an unfair agreement, or an aging and lonely person subject to undue influence by one of her few friends and his wife. (*Ibid.*, citing *Stenger v. Anderson* (1967) 66 Cal.2d 970, 979 & *O'Neil v. Spillane* (1975) 45 Cal.App.3d 147, 151.) The existence of such a confidential relationship is a question of fact. (*Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1161.)

*Analysis*

As to both the second and third causes of action, plaintiffs allege they stand in such a relationship to defendant, creating a duty of disclosure, because they entrusted to the school's care the children for whom they paid tuition, the plaintiffs were vulnerable because they relied on the school to protect their children, and the school accepted their confidence by undertaking to act on their behalf in exchange for tuition.

In our view, plaintiffs have not alleged the essential predicate of the vulnerability to the school on the part those who paid tuition. There is no allegation that either the named plaintiffs or the putative class members suffered from any incapacity, such as weakness of mind or advanced or

17

tender age rendering them vulnerable when selecting a private school, and no allegations that indicate the school accepted its " 'empowerment' " in relation to vulnerable plaintiffs or class members. (See *Richelle L.*, *supra*, 106 Cal.App.4th at p. 272.) Even assuming the youth of any students who contributed to their own tuition (such as Doe) rendered them vulnerable, that vulnerability does not extend to the parents and other adults who chose to pay an expensive private school's tuition rather than send their children to another private school or to a public school. As to the second cause of action, which requires a fiduciary or confidential relationship, the trial court correctly sustained the demurrer on this ground. For the same reasons, to the extent the third cause of action is based on a fiduciary or confidential relationship, it is insufficient.

We are not persuaded otherwise by plaintiffs' reliance on *Doe v. Superior Court* (2015) 237 Cal.App.4th 239 (*Doe*), which, borrowing from the law of negligence, concluded that a church that ran a summer camp had a duty to disclose to parents that a camp employee was suspected of molesting their young daughter. (*Id.* at pp. 241, 244–248.) The *Doe* court grounded this duty in the "special relationships" the camp had, both with its employee whose behavior it needed to control and with the camper and her parents who were foreseeable victims if the camp remained silent. (*Id.* at p. 246; see also *Phyllis P. v. Superior Court* (1986) 183 Cal.App.3d 1193, 1195–1196 [special relationship imposed duty on school to notify parents of eight-year-old that she had been sexually assaulted].) But the duty the *Doe* court imposed was one of "reasonable care" (*Doe*, at p. 246), not the heightened duty owed within the confines of a confidential relationship. We have no quarrel with *Doe*, which considered a defendant's obligation to prevent further harm to a child who had suffered sexual abuse, but it is not helpful

18

here, where there is no allegation that the students for whom plaintiffs paid tuition suffered any harm at all.

Plaintiffs argue that their cause of action for fraud by concealment survives demurrer on the alternate ground that the school had a duty to disclose because of its exclusive knowledge of material facts. They allege the school knew of the sexual and other improprieties by its faculty and staff members, and of its failure to investigate and report that abuse, and the school knew plaintiffs were unaware of, and could not reasonably discover, these facts for themselves. Plaintiffs rely upon *Bigler-Engler*, which explains that there is a duty to disclose, even in a transaction that does not involve a fiduciary or confidential relationship, where " 'the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff.' " (*Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 311.) Such a transaction arises only from direct dealings between the plaintiff and the defendant. (*Id*. at p. 312.)

Even assuming the relationship between the school and those who paid tuition qualifies as a transaction for these purposes—a point the school disputes—we agree with the trial court that these fraud claims cannot proceed. Also, they are not amenable to class treatment because common issues as to entitlement to relief do not predominate.

First, the complaint itself contradicts the allegation that the alleged sexual improprieties were within the school's sole knowledge. The complaint alleges that " 'people began to notice and comment on the close nature of [Morrone's] relationships with female students' " by approximately April 2004. Complaints about Morrone's behavior continued, and in 2006 and 2007 students and at least one parent complained about an inappropriate assignment, Morrone's flirting, and his "sexualized comments." In 2012, six

19

alumni of the school submitted a letter describing Morrone's inappropriate conduct toward them and other women during the time they were students. As rumors and complaints about Morrone's behavior continued to swirl, members of the school's administration conducted inquires in 2008 and 2013. Also, " '[m]any witnesses' " reported Morrone's aggressive and angry behavior toward male students, and a parent complained in 2018 that Morrone used a " 'free writing' exercise" to build a confiding relationship with her son before abruptly withdrawing his attention. Then in 2020, another former student reported that Morrone had engaged in sexual misconduct with female students, though the school still declined to take action until it heard directly from the affected students.

Taken together, these allegations establish that the school, many of its students, and some parents had information of concern about Morrone. The allegations suggest the school was insufficiently diligent in investigating and acting on the many complaints, but then, students and their families would have known this, too, for they knew that Morrone was still teaching at the school. The allegations refute plaintiff's contention that no one but the school knew about, or reasonably could learn of, the concerning behavior the school failed to disclose, and they accordingly defeat plaintiffs' argument for a duty to disclose based on the school's exclusive knowledge. (See *Bigler-Engler*, *supra*, 7 Cal.App.5th at p. 311 [duty may arise where " 'the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff' "].)

These allegations are relevant for a second reason as well. Class certification is appropriate only if common issues of law or fact predominate, that is, only if the issues framed by the pleadings and the law are susceptible to common proof for all members of the proposed class. (*Downey*, *supra*, 44

Cal.App.5th at p. 1113.)  But if class members will have to litigate "' "numerous and substantial questions" '" regarding their right to recover, even after a class judgment, common issues do not predominate.  (*Ibid*.)  If each class member's right to recover "' "clearly depends on a separate set of facts," '" the decision that common issues do not predominate may be made on demurrer.  (*Newell*, *supra*, 118 Cal.App.4th at pp. 1101–1103 [class treatment unwarranted where class members' right to recovery would require individual assessment of denial of insurance claims].)  This rule comes into play when we consider the elements of the cause of action for fraud by concealment, among them the requirements that the plaintiff was unaware of the facts concealed, and the plaintiff would have acted otherwise if aware.  (*SCC*, *supra*, 207 Cal.App.4th at p. 864.)

Focusing on the latter of these two elements, plaintiffs argue they are entitled to a class-wide presumption of materiality.  They contend that the school's failure to disclose its employees' improper behavior and its own failure to investigate and report it was material to all members of the class, and that they relied on the omission in deciding to pay tuition to the school.  For this point, they rely upon *People v. Johnson & Johnson* (2022) 77 Cal.App.5th 295, 328, which concluded a manufacturer's concealment of the risk of complications from use of a medical product was material because it prevented patients from making informed decisions about their own care.  They also draw our attention to *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 814, which explained that there is a rebuttable presumption of reliance "'[w]here representations have been made in regard to a material matter and action has been taken.'"  Similarly here, they argue, the improper behavior they allege, and the school's failure to disclose it, were "indisputably material" to the class members' decision to pay tuition.

21

A crucial difference between the cases upon which plaintiffs rely and the one before us is that the complaint alleges there were continuing rumors, as well as complaints from parents and students, about Morrone's behavior, raising substantial questions about whether individual class members relied upon (or were deceived by) the school's alleged failure to disclose these events. These questions would necessarily require separate adjudication of facts distinct to each absent class member, an inquiry that could be expected to swamp the common questions of what, and when, the school learned of its employees' alleged behavior, and what it did in response. (See *Schermer v. Tatum* (2016) 245 Cal.App.4th 912, 929 [class treatment unwarranted where issue of reliance would vary from one class member to another].) These individual questions, in our view, render class treatment inappropriate here, and the trial court correctly so found.

## IV.  Denial of Leave to Amend

Finally, plaintiffs contend the trial court abused its discretion in denying them leave to amend their complaint for a third time. Plaintiffs have the burden to show that there is a reasonable possibility the defect can be cured by amendment (*Tucker*, *supra*, 208 Cal.App.4th at p. 211; *Martis Camp*, *supra*, 53 Cal.App.5th at p. 610), and they have not met this burden.

The only amendment plaintiffs suggest is to a single allegation that contains essentially a scrivener's error. The complaint defines the class as parents, family members, guardians, or students who paid tuition from 2003 to 2020 for students who graduated before *July 2020*. In connection with the third cause of action, however, the complaint alleges that plaintiffs and putative class members paid tuition and attended, or had their children attend, from "2003 to the present," or *July 2023*, when the operative

22

complaint was signed and filed.  Plaintiffs sought leave to amend to remedy this inconsistency.

Because this amendment would not remedy the problems we have identified with any of the causes of action, plaintiffs have not shown the trial court abused its discretion in denying leave to amend.

## DISPOSITION

The judgment is affirmed.  Respondent shall recover its costs on appeal.


TUCHER, P. J.


WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.


*Suchard et al. v. Sonoma Academy* (A169841)

Trial Court:       Sonoma County Superior Court

Trial Judge:      Hon. Oscar Pardo

Counsel:          Schack Law Group, Alexander M. Schack, Natasha n. Serino, Shannon F. Nocon; Welty Weaver & Currie, Jack W. Weaver and Rachael M. McFarren for Plaintiffs and Appellants

Weintraub Tobin Chediak Coleman Grodin, Paul E. Caspari, Ryan E. Abernethy, and Brendan J. Begley for Defendant and Respondent